[No. S091069. Feb. 4, 2002.]

AMELCO ELECTRIC, Plaintiff and Respondent, v.
CITY OF THOUSAND OAKS, Defendant and Appellant.

**COUNSEL**

Mark G. Sellers, City Attorney; Negele & Associates, James R. Negele; Lascher & Lascher and Wendy C. Lascher for Defendant and Appellant.

Parker, Milliken, Clark, O'Hara & Samuelian, Brown, Winfield & Canzoneri, Nowland C. Hong, Michael M. Mullins and Michael S. Simon for the League of California Cities as Amicus Curiae on behalf of Defendant and Appellant.

Watt, Tieder, Hoffar & Fitzgerald, Michael G. Long, Gregory J. Dukellis and Dwight C. Hirsh for Plaintiff and Respondent.

Kamine, Steiner & Ungerer, Kamine Ungerer, Bernard S. Kamine, Matt Steiner and Joseph M. Rossini for Engineering Contractors' Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Monteleone & McCrory, Thomas P. McGuire and Joseph C. Malpasuto for Southern California Contractors Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Crowell & Moring, Donald E. Bradley; Rogers Joseph O'Donnell & Phillips, Neil H. O'Donnell and Aaron P. Silberman for the Associated General Contractors of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Perkins & Miltner and Timothy E. Salter for the National Electrical Contractors Association, District Nine as Amicus Curiae on behalf of Plaintiff and Respondent.

Case, Ibrahim & Clauss, Brian S. Case, F. Albert Ibrahim and Charles W. Losness for Associations of Specialty Contractors as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**BROWN, J.**—In this case we determine whether the abandonment theory of liability applies against a public agency, and whether plaintiff public works contractor, which sued for breach or abandonment of the public works contract, is entitled to compensation under a total cost method of measuring damages. The jury found the contract was breached and abandoned, and awarded total cost damages. The Court of Appeal affirmed. We conclude the

theory of abandonment does not apply against a public entity, and that Amelco Electric failed to adduce sufficient evidence to warrant instructing the jury on total cost damages for breach of contract. We therefore reverse the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1992, defendant City of Thousand Oaks (City) solicited bids for electrical work to be performed in the construction of the Civic Arts Plaza, a project including a civic center or office building, a dual-purpose 400-seat council chamber and forum theater, an 1,800-seat civic auditorium or performing arts theater, and an outside area (the project). Instead of a general contractor, the project was managed by Lehrer McGovern Bovis, Inc. (LMB), and the City solicited bids for the various prime contracts. City received five electrical work bids. Amelco Electric (Amelco), one of the largest electrical contractors in the United States, bid $6,158,378, and was awarded the contract. All five bids came within 10 percent of each other and the three lowest bids were within 3 percent of each other.

During the two-year construction process, City furnished 1,018 sequentially numbered sketches to the various contractors to clarify or change the original contract drawings, or to respond to requests for information. The vast majority of the changes were to one building, the civic center or office building, and to the outside lighting. Of the sketches issued, 248 affected the electrical cost. Amelco requested 221 change orders, and City and Amelco agreed upon 32 change orders encompassing these change order requests. As a result of these change orders, City paid Amelco $1,009,728 above the contract price, an increase of nearly 17 percent.

Amelco claimed at trial that the project involved an unusually high number of sketches that were difficult to work with. Amelco further claimed that scheduling the various contractors' work became more difficult as a result of the changes. Amelco testified it was at times required to delay or accelerate particular tasks and to shift workers among tasks to accommodate work by other trades. While Amelco maintained daily records of its work activities, it was unable to produce documentation of instances in which its performance of a work directive or change order was delayed or interfered with by LMB's actions, and for which it was not compensated. The general foreman, the person responsible for actually recording the information, was given a hypothetical regarding recordkeeping practices: "[I]f you came to this courtroom to work today, . . . and the wall was moved, that would be something you would put in your daily log?" "No." "You wouldn't note that?" "I wouldn't put it down on my daily log."

Amelco's vice-president asserted the sheer number of changes made it "impossible" to keep track of the impact any one change had on the project or on Amelco, likening the effect to "death by 1,000 cuts." Amelco conceded it was inefficient in performing the work, but assigned responsibility for virtually all of that inefficiency to LMB.

In May 1993, Amelco wrote to LMB concerning "Work Directive 48, addendum No. 1," which Amelco asserted improperly shifted engineering documentation responsibilities to Amelco. Amelco also expressed concern that the electrical drawings being issued did not identify all revisions, or contain all prior revisions, and gave examples of how these omissions interfered with its performance. Amelco requested a change order and $203,759 in additional funds to hire a drafter to update the drawings, a foreperson, and a project engineer. LMB refused additional funds on the ground that these tasks were included in the original contract price. Amelco claimed at trial that it accepted this decision, did not hire any additional personnel to do the work, and signed a change order for zero dollars and zero additional time, because LMB verbally promised that "things are going to get better."

On July 29, 1994, over a year later, and approximately two months before the project was completed, Amelco sent a letter requesting a second change order be issued for Work Directive No. 48. Amelco asserted the executed change order did "not include any field productive labor impact or related problems," and that "[t]he price for this work will follow in the near future."

In January 1995, Amelco submitted a $1.7 million total cost claim for costs allegedly resulting from the noncaptured costs of the change orders. The testimony was in conflict whether LMB had requested that Amelco submit such a claim; in any event, the claim was rejected. Amelco filed this action, ultimately alleging abandonment and breach of the construction contract. By the time of trial, Amelco's claim had increased to $2,224,842 because of the discovery of additional costs.

The City asserted Amelco lost money on the project because it failed to start work promptly on the project, did not coordinate its work with other trades, such as by regularly attending mandatory coordination meetings, reduced its workforce so that it did not have enough workers to install the major electrical system components efficiently, did not have an organized manner of incorporating changes into the drawings (unlike other contractors on the project), performed work on the project under at least one subcontract for a different subcontractor during this period, and generally mismanaged its work.

After a five-week trial, the jury found the City had both breached and abandoned the contract, and awarded Amelco $2,134,586 respectively (but not cumulatively) for each claim.

The Court of Appeal affirmed. As relevant here, it concluded that as a matter of law a public works contract can be abandoned, and the jury was properly instructed on the measure of damages.

We granted the City's petition for review.

## II. DISCUSSION

### A. Does the Abandonment Theory of Liability Apply Against a Public Entity?

#### 1. Background

■ In general, under long-standing California law, if a public contract is declared void, a contractor may not be paid for work performed under that contract. (*Miller v. McKinnon* (1942) 20 Cal.2d 83, 89 [124 P.2d 34, 140 A.L.R. 570] (*Miller*).) In *Miller*, we explained, "Persons dealing with the public agency are presumed to know the law with respect to the requirement of competitive bidding and act at their peril. . . . [¶] . . . If, as we have seen, the contract is absolutely void as being in excess of the agency's power, the contractor acts at his peril, and he cannot recover payment for the work performed." (*Miller*, at p. 89.)

Similarly, this court has not generally allowed quantum meruit recovery for extra work performed beyond the contract requirements. (*Zottman v. San Francisco* (1862) 20 Cal. 96, 101, 105-106 (*Zottman*).) In *Zottman*, the contractors were hired by the City of San Francisco to do work improving Portsmouth Square, including constructing a fence around the square. (*Id.* at p. 99.) After the contract was entered into, the officials appointed by the city's common council, "in [the] presence of the City Attorney, the President of the Board of Aldermen, and of different members of the Board, ordered the contractors to perform . . . extra work . . . —that is, to construct a stone base in place of the one of wood, and to paint the iron of the fence—and assured them that the city would pay them therefor. . . . [A]ll the members of the Common Council must have been aware of the order to the contractors, as the work was in full view from the windows of the Council chambers, and was the subject of general conversation and approval by the members at their various sessions and elsewhere, and no opposition to it was ever expressed by any member." (*Id.* at p. 99.) When the contractors were

not paid for the extra work, they sued the city, and nonsuit was entered in the city's favor. (*Id.* at p. 100.)

We affirmed on the ground the city charter authorized only a contract given to the lowest bidder. (*Zottman, supra,* 20 Cal. at pp. 103, 108.) "A contract made in disregard of these stringent but wise provisions cannot be the ground of any claim against the city. . . . The mode in which [the Common Council] could bind the [municipal] corporation by a contract for the improvement of city property was prescribed by the charter, and no validity could be given by them to a contract made in any other manner." (*Id.* at pp. 101-102.) We observed, " 'It may sometimes seem a hardship upon a contractor that all compensation for work done, etc., should be denied him; but it should be remembered that he, no less than the officers of the corporation, when he deals in a matter expressly provided for in the charter, is bound to see to it that the charter is complied with. If he neglect[s] this, or choose[s] to take the hazard, he is a mere volunteer, and suffers only what he ought to have anticipated. If the statute forbids the contract which he has made, he knows it, or ought to know it, before he places his money or services at hazard.' " (*Id.* at pp. 104-105; *Los Angeles Dredging Co. v. Long Beach* (1930) 210 Cal. 348, 353 [291 P. 839, 71 A.L.R. 161] [it is "settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable"]; *First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 669 [76 Cal.Rptr.2d 626] ["No case has ever held that a city may be bound to a contract by estoppel"]; *id.* at p. 671 ["[T]he proposition that a contract with a city is not binding unless formed in accordance with the city charter has been in place in California at least since the time of the Civil War, and is based on analogous authority traceable back to Chief Justice Marshall"].)

The question in this case is whether a public entity is liable under an abandonment theory to a contractor when it makes numerous changes to the contract work, and these changes allegedly make it difficult and more costly to perform the contract because of delay, interference with the work of other trades, and other problems not captured in the price of the executed change orders. In California, the Courts of Appeal have concluded that private parties may impliedly abandon a contract when they fail to follow change order procedures and when the final product differs substantially from the original. (*Opdyke & Butler v. Silver* (1952) 111 Cal.App.2d 912, 913-914, 916, 918-919 [245 P.2d 306] (*Opdyke*) [owner made numerous changes, the parties consistently ignored the requirement that changes be in writing and priced before the work was done, and owner paid sums substantially over the maximum contract limit without requesting justification for

the extra work]; *Daugherty Co. v. Kimberly-Clark Corp.* (1971) 14 Cal.App.3d 151, 154-156, 159 [92 Cal.Rptr. 120] [summary judgment reversed because of disputed issues of fact on abandonment and other issues; noted "the parties consistently ignored the procedures provided by the contract for the doing of extra work," and that "[a]bandonment of the contract can occur in instances where the scope of the work when undertaken greatly exceeds that called for under the contract"].)

In *C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 632-634 [218 Cal.Rptr. 592] (*Peterson*), Container Corporation of America (CCA) contracted with C. Norman Peterson Co. (CNP) to modernize CCA's recycling mill based in part on drawings by CCA's engineer Industrial Mechanical Corporation. "During the first 14 months, the work was to be performed while the papermill was in operation. During the next two months, work was to be performed while the mill was shut down. This shutdown period was the most critical phase of the project; time was of the essence during this period so the mill could be restarted. There was then to be a two-month cleanup period." (*Id.* at p. 633.) During the shutdown phase hundreds of changes were ordered, and the written change order procedure was abandoned—"it became 'strictly oral.' " (*Id.* at p. 637.)

On appeal, the court affirmed the judgment entered in CNP's favor. It noted, a construction contract is abandoned "when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered." (*Peterson, supra,* 172 Cal.App.3d at p. 640.) "[A]bandonment requires a finding that *both* parties intended to disregard the contract." (*Id.* at p. 643; *Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 474 [47 Cal.Rptr.2d 12] ["Abandonment occurs . . . only where both contracting parties agree 'that the contract is terminated and of no further force and effect' "].) "Although the *contract* may be abandoned, the *work* is not." (*Peterson,* at p. 640.)

In *Peterson,* there were "hundreds of changes, many of them significant, resulting in extra work having to be performed by CNP. As in *Opdyke,* the requirement for written change orders was ignored during most of the project period, and it was completely abandoned during the critical shutdown stage." (*Peterson, supra,* 172 Cal.App.3d at p. 641.) Moreover, the Industrial Mechanical Corporation engineer spent 16,414 hours redesigning the project after work had begun. (*Id.* at pp. 636, 642.)

The Court of Appeal also upheld the trial court's further finding that CCA had breached the contract. (*Peterson, supra,* 172 Cal.App.3d at pp. 642-644.) "[R]ather than being inconsistent with abandonment, . . . breaches by CCA

were actually the precipitating cause for the construction contract being abandoned within the meaning of *Daugherty* and *Opdyke* and the subsequent implicit understanding by the parties to proceed with the project on a quantum meruit basis. So long as there was no double recovery based on the trial court's dual findings, we conclude the trial court could properly find both a breach of the contract and a subsequent abandonment of the contract brought about by the breach." (*Id.* at pp. 643-644.)

*Dodge v. Harbor Boat Bldg. Co.* (1950) 99 Cal.App.2d 782 [222 P.2d 697] (*Dodge*) also appears to be cited by Amelco as an abandonment case, but it does not seem to rely on this theory. In *Dodge*, National Ship Service Co., Inc. (National Ship) performed subcontracting work for Harbor Boat Building Co. (Harbor Boat) "moth-balling" two naval vessels. (*Id.* at pp. 784-785.) While the project was ongoing, the Navy stated that change orders would be issued to account for certain extra work, and invited the contractors to submit a request. (*Id.* at p. 786.) National Ship submitted to Harbor Boat a detailed description of its $79,592.65 of extra work (*id.* at p. 789) requested by Harbor Boat that was " 'different from the original specifications or not specified at all.' " (*Id.* at p. 787.) National Ship invited Harbor Boat to inspect its records; Harbor Boat accepted them as correct. (*Id.* at p. 791.) Harbor Boat submitted a consolidated request to the Navy, which did not separately delineate National Ship's costs. (*Id.* at pp. 789, 791.) While Harbor Boat was paid $141,622 from the Navy for the extra work, it paid National Ship nothing. (*Id.* at p. 789.) The trial court awarded National Ship a net judgment of $61,610, apparently on a quantum meruit theory. (*Id.* at p. 791.)

The Court of Appeal affirmed, noting there was an implicit "determination by the trial court that the value of the work done by National Ship provided a proper basis for a judgment in its favor and that it was unnecessary to sue on the original contract." (*Dodge, supra*, 99 Cal.App.2d at p. 790.) The court noted that "a different result would not have been reached if plaintiff had sued upon the contract, and also for the extra work." (*Id.* at p. 791.)

Hence, in *Dodge*, it appears the contractor carefully delineated its $79,592.65 in costs (*Dodge, supra*, 99 Cal.App.2d at p. 789) from the extra work requested by Harbor Boat that was " 'different from the original specifications or not specified at all.' " (*Id.* at p. 787.) Harbor Boat was paid for that and its own extra work, but failed to pass on any portion of the Navy's payment to National Ship. This obvious inequity does not suggest the Court of Appeal concluded the contract was abandoned, but rather that National Ship was found to be entitled to payment for at least a portion of the authorized extra work. Indeed, the Court of Appeal noted that "a

different result would not have been reached if plaintiff had sued upon the contract, and also for the extra work." (*Id.* at p. 791.)

The United States Federal Court of Claims has historically recognized government breach of contract liability under the doctrine of cardinal change. Here, Amelco asserts the abandonment doctrine is coextensive with the cardinal change doctrine. In fact, the theories are fundamentally different. Under *Opdyke* and *Peterson*, once the parties cease to follow the contract's change order process, and the final project is materially different from the project contracted for, the contract is deemed inapplicable or abandoned and is set aside. The plaintiff may then recover the reasonable costs for all of its work. (*Peterson, supra,* 172 Cal.App.3d at p. 645; see *Opdyke, supra,* 111 Cal.App.2d at p. 919.) There is little, if any, separation between the theory of liability and the measure of damages. This is the approach Amelco urges we apply here.

Under the cardinal change doctrine, the cardinal change "constitutes a material breach of the contract." (*Alliant Techsystems, Inc. v. U.S.* (Fed.Cir. 1999) 178 F.3d 1260, 1276 (*Alliant*).) The contractor may recover breach of contract damages for that additional work. (*Saddler v. United States* (Ct.Cl. 1961) 287 F.2d 411, 414-416 [cardinal change entitled contractor to expenses properly attributable to changes defendant required]; *Air-A-Plane Corporation v. United States* (Ct.Cl. 1969) 408 F.2d 1030, 1033.) There is no hint in any Federal Circuit or Court of Claims case to which we have been directed that the terms of the federal contract are held inapplicable or set aside for the period prior to the breach, or that the government's payments for other work not affected by the cardinal change are suddenly compensated on a quantum meruit basis. (See, e.g., *Stone Forest Industries, Inc. v. U.S.* (Fed.Cir. 1992) 973 F.2d 1548, 1552 ["If only a severable portion of a contract was breached, the non-breaching party can recover damages for that portion of the contract but its remaining contractual duties are not discharged"] and cited in *Alliant,* at p. 1276; *Stone Forest Industries, Inc.,* at p. 1552 ["if a contract is not clearly divisible . . . the breaching party can not require the non-breaching party to continue to perform what is left of the contract"]; *Alliant,* at p. 1276 ["Such a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause"].) Moreover, the jury in this case was never instructed on the cardinal change theory. We therefore do not reach the issues of whether the cardinal change theory applies in California, and whether the change here was cardinal.

### 2. *Analysis*

We now consider whether the abandonment theory of liability applies against a public entity. We conclude it does not, since such a theory

is fundamentally inconsistent with the purpose of the competitive bidding statutes.

Under the abandonment doctrine, once the parties cease to follow the contract's change order process, and the final project has become materially different from the project contracted for, the entire contract—including its notice, documentation, changes, and cost provisions—is deemed inapplicable or abandoned, and the plaintiff may recover the reasonable value for all of its work. Were we to conclude such a theory applied in the public works context, the notion of competitive bidding would become meaningless.

Even assuming there is substantial evidence of abandonment in this case, the entire notion of the parties abandoning a public works contract, with its strict statutory requirements, is anomalous. General law cities, such as the City of Thousand Oaks, are statutorily required to award public contracts in excess of $5,000 to the lowest responsible bidder. (Pub. Contract Code, § 20162.) We have generally not allowed recovery on a quantum meruit basis where there is a defect in the bidding rendering the contract void. (*Miller, supra,* 20 Cal.2d at p. 89.) Amelco asserts this principle is inapplicable when the underlying contract was valid when entered into, and that "the competitive bidding laws are irrelevant to the propriety of the award" in this case. However, if we were to agree the City's numerous changes could result in the public contract being set aside in its entirety, Amelco would find itself in no different situation, and should receive no different treatment, than a contractor who has performed under a void contract. The City would not have had the authority to contract with Amelco for a quantum meruit payment, free from any of the prior contract's restraints, but would have been required to bid the project. "*A fortiori* the court [is] without authority to abrogate the bidding statute and make a new contract between the parties which the defendants were powerless to do." (*Paterson v. Board of Trustees* (1958) 157 Cal.App.2d 811, 819 [321 P.2d 825].)

"[I]t is clear 'that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public.' " (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 316 [96 Cal.Rptr.2d 747, 1 P.3d 63] (*Kajima*).) "We have stated that the competitive bidding statutes are ' "enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest." ' " (*Id.* at pp. 316-317.) It is difficult, however, to

ascertain how the general public benefits by allowing a contractor to claim abandonment of the public works contract following completion of the work, and recover for the reasonable value of its work; indeed, just the opposite seems true. Permitting such recovery would appear to unduly punish the tax-paying public.

Moreover, allowing a contractor to claim, following completion of the work, that the parties implicitly set aside a public works contract implicates significant public policy concerns. Under the abandonment doctrine, the plaintiff need not demonstrate—and even now Amelco cannot state—at what point the contract was abandoned. As one of Amelco's experts testified, "So there's no one point in time where Amelco could have sat back and said, gee, they've abandoned the contract, except maybe at the end when they got all their costs together and they looked back and said, wow, what just happened to us. And I guess that's when they knew it was abandoned." Amelco's project manager did not even determine Amelco had a claim on the project until November 1994, after the work was completed. Under Amelco's approach, a certain number of changes may be permissible, but at some indeterminate point, the next requested change makes the number "excessive," the competitively bid contract is set aside, and the contractor recovers on a quantum meruit basis from the beginning of the project onward. Such a vague definition fails to provide any meaningful guidance as to when that line has been crossed. Public entities would not receive timely notice of claims that would allow them to make project management, budget, or procedural adjustments during the course of construction. Rather, contractors would be permitted to wait until a project was completed before giving notice of "too many" changes, thus creating intolerable uncertainty in the budgeting and financing of construction projects.

In addition, allowing contractors to recover in quantum meruit for the actual as opposed to the bid cost of a project would encourage contractors to bid unrealistically low, with the hope of prevailing on an abandonment claim, based on the numerous changes inherent in any large public works project. One of the purposes of the public contracting laws is to prevent collusion and favoritism in selecting contractors. (Pub. Contract Code, § 100, subd. (d) [Legislature's intent in enacting Public Contract Code includes "eliminat[ing] favoritism, fraud, and corruption in the awarding of public contracts"].) One can imagine a situation where a friend of a public official bids extremely low, with the understanding that numerous changes in the contract, many perhaps not even affecting the contractor, will be forthcoming. Such scenarios would simply provide an end run around the public works bidding requirements. Moreover, if abandonment is recognized as a theory of recovery for public works, "the possibility of significant monetary

gain alone may encourage frivolous litigation and further expend public resources." (*Kajima, supra,* 23 Cal.4th at p. 317.) Finally, "prudence is warranted whenever courts fashion damages remedies in an area of law governed by an extensive statutory scheme." (*Ibid.*)

Public Contract Code section 7105 provides in part that a public works contract required to be awarded by competitive bid, "may be terminated, amended, or modified only if the termination, amendment, or modification is so provided in the contract or is authorized under provision of law other than this subdivision. The compensation payable, if any, for amendments and modifications shall be determined as provided in the contract. The compensation payable, if any, in the event the contract is so terminated shall be determined as provided in the contract or applicable statutory provision providing for the termination." (Pub. Contract Code, § 7105, subd. (d)(2).)

Amelco contends Public Contract Code section 7105 applies only to compensation for termination, amendment, or modification of a contract, not to damages for its abandonment. Under the abandonment theory, however, the original contract is set aside and the contractor paid for the reasonable value of its work. It is difficult to understand how such a radical change is not a modification or termination of the public contract subject to section 7105. Indeed, given a public works project must generally be governed by a valid contract, abandonment cannot be one of the changes "authorized under provision of law" contemplated by section 7105.

Amelco observes Civil Code section 3262, pertaining to mechanic's liens, was amended in 1993 to include "abandonment" in subdivision (d)(1) and (2). Subdivision (d)(1) and (2) specifies that waiver and release forms required from a contractor to receive progress payments must contain substantially the following language: "This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, *abandonment*, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment." (Italics added.) Amelco argues that by this amendment, "the Legislature has clearly recognized the doctrine of abandonment in the construction contract context." Asserting Civil Code section 3262 is applicable to both private and public contracts, Amelco argues it evidences a legislative intent "that abandonment claims are valid against public agencies and not inconsistent with the statutory competitive bidding scheme it created."

It is not clear what the Legislature meant in amending the sample forms in Civil Code section 3262. The amended language does not, however, ineluctably mean the Legislature is endorsing the abandonment theory for public

contracts. It may mean nothing more than if such a claim is available, it is not waived by signing the release. Indeed, it is unlikely the Legislature intended to recognize the abandonment doctrine for public works as well as private contracts. Such a conclusion, arguably overturning decades of case law regarding the unavailability of quantum meruit recovery against a public entity, would no doubt be more prominently featured than by simply amending a sample form regarding mechanic's liens.

While Amelco relies on California abandonment cases, such as *Opdyke*, *supra*, 111 Cal.App.2d 912, and *Peterson*, *supra*, 172 Cal.App.3d 628, they are distinguishable on the ground they involved private, not public, parties. Amelco is one of the largest electrical contractors in the country, and certainly was aware at the time it was building this project that public works contracts are the subject of intensive statutory regulation and lack the freedom of modification present in private party contracts.

Amelco also asserts the City is liable for a breach of its agreement in the same manner as a private party. That is correct, and in this case the jury found the City had breached the contract. Recovery for a specific breach, however, with its requirements of causation and damages, is far different from abandonment, in which the entire competitively bid contract is set aside, and the contractor recovers on a quantum meruit basis from the beginning of the project onward.

The dissenting opinion broadly refers to "the rule usually applied in this country." (Dis. opn. of Werdegar, J., *post*, at p. 251.) It cites, however, no out-of-state or federal authority upholding the abandonment doctrine in the public works context. Rather, it relies solely on the cardinal change doctrine, which, as we have already described, is materially different from abandonment. (See *ante*, p. 238.)

B. *Measure of Damages*

 We next consider whether Amelco adduced sufficient evidence to warrant instructing the jury on the total cost method of measuring damages. The City does not argue total cost recovery is never appropriate against a public agency, only that such a damages theory is inappropriate here. For this reason, we do not determine whether total cost damages are ever appropriate in a breach of public contract case, but rather whether the theory for such damages was in this case properly submitted to the jury.

Nor does the City challenge the jury's finding of breach of contract; rather, it challenges only the manner in which damages were calculated. In particular, it asserts that in order to proceed on a total cost theory Amelco

should have been required to establish (1) the impracticality of proving actual losses directly; (2) the plaintiff's bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs. (*Servidone Const. Corp. v. U.S.* (Fed. Cir. 1991) 931 F.2d 860, 861 (*Servidone*); see Aaen, *The Total Cost Method of Calculating Damages in Construction Cases* (July 1991) 22 Pacific L.J. 1185, 1195-1196 (Aaen), citing *WRB Corporation v. United States* (1968) 183 Ct.Cl. 409, 426 (*WRB*).) The Court of Appeal concluded the City had waived this claim by failing to request an appropriate jury instruction. However, as we understand the City's claim, the City essentially asserts not instructional error, but that there was not sufficient evidence to warrant instructing the jury on the total cost theory of damages. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298] [a party is entitled upon request to instruction on every theory supported by substantial evidence].)

### 1. *Background*

■ Under a breach of contract theory, the plaintiff must demonstrate a contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and damage to the plaintiff. (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 476, p. 570.) " 'Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise.' " (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 550 [87 Cal.Rptr.2d 886, 981 P.2d 978].) "[P]redictability about the cost of contractual relationships plays an important role in our commercial system." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373].)

■ The total cost method of determining damages is generally disfavored. (*Servidone, supra,* 931 F.2d at p. 861 ["A trial court must use the total cost method with caution and as a last resort"]; *WRB, supra,* 183 Ct.Cl. at p. 426 ["This theory has never been favored by the court and has been tolerated only when no other mode was available"].) Under this method, damages are determined by "subtracting the contract amount from the total cost of performance." (Aaen, *supra,* 22 Pacific L.J. at p. 1187, fn. omitted; see also *State of California ex rel. Dept. of Transportation. v. Guy F. Atkinson Co.* (1986) 187 Cal.App.3d 25, 32-34 [231 Cal.Rptr. 382] [upholding application of jury verdict method, which is "used to determine a rough approximation of damages, especially in sizable construction cases when mathematical precision is impossible"].) Before this method may be used, the trial court

bears the initial responsibility of determining that each element of the four-part test set forth above can be met. (See Aaen, at pp. 1195-1196; *id.* at p. 1187 ["Courts have developed a four-part test which must be met before the total cost method will be used." (fn. omitted)]; cf. *Geolar, Inc. v. Gilbert/Commonwealth* (Alaska 1994) 874 P.2d 937, 945.) If prima facie evidence under this test is established, the trier of fact then applies the same test to determine the amount of total cost or modified total cost damages to which the plaintiff is entitled. "The total cost method is not a substitute for proof of causation," (Aaen, at p. 1190) and "should be applied only to the smallest affected portion of the contractual relationship that can be clearly identified." (*Id.* at p. 1198.) As the United States Court of Appeals for the Federal Circuit has stated, "Clearly, the 'actual cost method' is preferred because it provides the court . . . with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor." (*Dawco Const., Inc. v. U.S.* (Fed.Cir. 1991) 930 F.2d 872, 882, overruled on other grounds in *Reflectone, Inc. v. Dalton* (Fed.Cir. 1995) 60 F.3d 1572, 1583.)

In *Boyajian v. United States* (Ct.Cl. 1970) 423 F.2d 1231 (*Boyajian*), the United States Court of Claims dismissed certain contract claims because of the failure to demonstrate proof of damages. In *Boyajian*, the plaintiff combined all of the alleged breaches of contract, and "without in any way attempting to relate any specific damage items to any particular breach, simply claim[ed] the excess of the entire amount spent in performing the contract over the total contract amount received." (*Id.* at p. 1241.) "[T]he proof . . . in effect consisted only of a schedule, supported by an accountant's testimony, indicating what plaintiff's books and records showed were plaintiff's total contract costs, the total contract receipts, and plaintiff's total loss, being the difference between the costs and the receipts. . . . [T]his is not in and of itself acceptable 'proof.' . . . 'The costs must be tied in to fault on defendant's part. Plaintiff's claim is something like an attempt to secure damages based on the difference between costs and the contract price or a bid price.' " (*Id.* at p. 1239.) " '[P]roof that the plaintiff's costs . . . exceeded his payments under the contract would not in the usual case give rise to his right to recover the difference.' " (*Ibid.*) "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach." (*Id.* at p. 1235.) "[C]ontrary to these basic causal-connection damage principles, no attempt is here made to relate any specific amount of increased costs to any particular alleged breach. Nor is any satisfactory explanation given as to why such an attempt was not made or why it would not have produced reasonably accurate results." (*Ibid.*) "On this record, it is not possible to

conclude that plaintiff's total contract loss, *i.e.*, the difference between plaintiff's contract expenditures and its contract receipts, is reasonably to be equated with the increased costs directly resulting from defendant's alleged breaches." (*Id.* at p. 1236; see *WRB, supra,* 183 Ct.Cl. at p. 426 [this case fails the four-part test because of "plaintiff's complete failure to maintain accurate cost records during performance" and failure to rebut government evidence that increased cost is partly plaintiff's fault].)

Likewise in *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278 [136 Cal.Rptr. 603], the contractor claimed that the architect's plans and specifications were negligently prepared and contained errors and omissions, and that the architects were negligent and dilatory in approving change orders, approving shop drawings, and in the overall supervision of the work. (*Id.* at p. 289.) Relying on *Boyajian, supra,* 423 F.2d 1231, the court rejected the contractor's claim that it should have been entitled to rely on the total cost theory (*Huber,* at pp. 307-309), stating, "it is obvious that Contractor could have maintained a proper accounting system to establish its alleged damage proximately caused by [defendant's] alleged negligence, if it had desired to do so." (*Id.* at p. 309.) "If we were to accept Contractor's contention as the law of this state, the result would, for all practical purposes, nullify all laws regarding competitive bidding on public contracts. Under such a concept, contractors could submit any bid necessary to obtain the job knowing that the public agency (or its architects) would be required to pay whatever costs contractor incurred on the project if contractor could discover some error or omission *however irrelevant* in the plans and specifications." (*Id.* at p. 310.) "In the final analysis what Contractor actually complains of is that the amount of money which Owner paid Contractor under the 25 [change orders] and the time allowed for the changes or additional work was not sufficient to reimburse Contractor for its total cost and total delay." (*Ibid.*) "It was within Contractor's legal power to compute estimated change order costs in a manner which would compensate Contractor for its total loss. It failed to do so." (*Ibid.*)

## 2. *Analysis*

We conclude Amelco failed to adduce substantial evidence to warrant instructing the jury on the four-part total cost theory of damages. In particular, Amelco failed to adduce evidence to satisfy at least the fourth element of the four-part test, i.e., that it was not responsible for the added expenses. A corollary of this element of the test is that the contractor must demonstrate the defendant, and not anyone else, is responsible for the additional cost. (*S. W. Electronics & Mfg. Corp. v. United States* (Ct.Cl. 1981) 655 F.2d 1078, 1087 ["defendant is not liable for all of the added expense which plaintiff incurred and therefore plaintiff's total cost claim must fail"]; Aaen, *supra,* 22

Pacific L.J. at p. 1202 [In complex situations that may involve multiple prime contractors, the "plaintiff must prove not only that he or she was not liable for the extra cost in this situation but that the defendant was responsible"].)

Here, as in *Boyajian, supra*, 423 F.2d 1231, Amelco alleged and the jury was instructed it could find a breach of the contract on numerous grounds, including breach of the implied warranty of correctness, breach of contract by preventing or hindering plaintiff's performance of the contract, providing an inadequate design, making excessive changes to the project, making changes in a disorganized manner, failing to properly coordinate the work of the multiple prime contractors, accelerating Amelco's work, and failing to make payments to Amelco in a timely manner.[1] Amelco never attempted to demonstrate how a particular alleged breach caused certain damages. Rather, Amelco conceded no effort was made during the project to distinguish between those inefficiencies that were Amelco's and those believed to be the

---

[1]The jury was instructed regarding the breach of contract claim, "By furnishing plans and specifications to bidders on a construction project, the owner thereby warrants that the plans and specifications are reasonably accurate and suitable for their intended purpose." "The City breached the contract if the City provided important facts about the project to Amelco, at bid time, such as in the plans or specifications, which Amelco relied upon, but the City: 1. Failed to disclose other material facts which materially qualified the facts which were disclosed; or 2. Failed to disclose other material facts, the absence of which made the facts disclosed likely to mislead Amelco; or 3. Failed to disclose other material facts which were known or accessible only to the City, and which the City knew were not known by Amelco, [and] not reasonably discoverable by Amelco." The City "breached the contract if [it] prevented or hindered plaintiff['s] . . . performance of the contract." In addition, the jury was instructed, "Amelco claims the City breached and/or abandoned the contract by doing the following: 1. Providing an inadequate design; 2. Making excessive changes to the project; 3. Making changes in a disorganized manner; 4. Failing to properly coordinate the work of the multiple prime contractors; 5. Accelerating Amelco's work; and 6. Failing to make payments to Amelco in a timely manner."

"If you find that the City breached or abandoned the contract, then Amelco is entitled to recover the reasonable value of the work performed by it less the payments made by the City, and less any costs incurred by Amelco which are not fairly attributable to the City." "The measure of damages for the breach of contract is that amount which will compensate the injured party for all the detriment or loss caused by the breach, or which in the ordinary course of things, would [be] likely to result therefrom. The injured party should receive those damages naturally arising from the breach, or those damages which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach. As nearly as possible, the injured party should receive the equivalent of the benefits of performance. [¶] Damages must be reasonable. A party cannot receive a greater amount as damages than he could have gained by full performance of the contract." "[O]nce a Plaintiff . . . proves that it is reasonably certain that it has suffered a particular loss or type of harm as a result of the breach by the Defendant . . . , the law does not require Plaintiff . . . to prove the exact amount of that loss or harm." "[Y]ou may not award any damages for a loss or harm resulting from a breach of contract if Defendant proves that Plaintiff could have avoided that loss or harm by making reasonable efforts or expenditures once it became aware of the breach."

responsibility of the City (and presumably other prime contractors and subcontractors). Moreover, Amelco conceded it had been inefficient in performing the contract and that it had reduced its claim by an apparently arbitrary 5 percent, or $116,843, to account for any inefficiency on its part in performing the contract. For the remaining 95 percent, the jury was simply asked to assume this inefficiency was the fault of LMB.

Nor did Amelco demonstrate when any particular breach occurred. Rather, it sought to recover all of its costs over the life of the contract if the jury found at any undetermined point the contract had been breached.

Amelco asserts we have applied the total cost method in cases involving breach of the implied warranty of correctness, citing *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466 P.2d 996], and *City of Salinas v. Souza & McCue Construction Co.* (1967) 66 Cal.2d 217 [57 Cal.Rptr. 337, 424 P.2d 921], disapproved on other grounds in *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 14 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398]. At the outset, it is not clear the jury here found the City had breached the implied warranty of correctness. As noted, the jury was instructed on several possible breach theories, and was not required to indicate which theory its verdict was based on. In any event, both *Warner* and *City of Salinas* appear to award only those damages attributable to the breach, not the contractor's total costs under the entire contract. (*Warner*, at p. 301 [plaintiff should recover additional cost of construction attributable to city's misrepresentation]; *City of Salinas*, at p. 225 [difference between fair and reasonable cost of actual performance, and what it would have been in the absence of misrepresentation, due to the city's misrepresentation].) As noted, Amelco has failed to demonstrate such a causal connection here.

Amelco asserts that even if the jury should have been instructed on the four-part total cost test, that error was harmless because these factors were adequately covered by other instructions. As we view the City's contention, however, the issue is whether the jury should have been instructed on the theory of total cost damages at all.

In any event, we disagree the jury was sufficiently guided by the totality of the instructions that damages had to be linked to a particular breach by the City. The jury was instructed, "If you find that the City breached or abandoned the contract, then Amelco is entitled to recover the reasonable value of the work performed by it less the payments made by the City, and less any costs incurred by Amelco which are not fairly attributable to the City." Under such global instruction, caused in part by the misinstruction on

abandonment, the jury was led to believe if it found any basis for breach of contract, regardless of when it occurred in the performance of the contract, Amelco was entitled to receive damages for the reasonable value of work performed by it during the life of the contract. Indeed, relying on this instruction, Amelco argued to the jury, "If you find either that Amelco's and the city's contract was abandoned or it was breached, the method of calculating the damage is the same." Amelco conceded it was unable to identify those costs attributable to the City and those costs attributable to itself and others. Hence, it is unclear what evidence the jury would have looked to in determining those amounts "not fairly attributable to" the City's actions. Nor did other breach of contract instructions clarify the jury was to correlate the damages to a particular breach, and not simply award damages for the reasonable value of the work performed over the life of the contract if any breach was found.

Amelco also asserts that if we fail to uphold the total cost method here, "[p]ublic entities [will] be motivated to change, mismanage and disrupt problem projects as much as possible to make it impossible for a contractor to determine the separate cost of each distinct change." Here, Amelco has simply failed to demonstrate the existence of such impossibility.

Under these circumstances, the jury should not have been instructed to calculate Amelco's loss from any breach of contract under a total cost measure of damages.

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the part regarding breach of contract is remanded to the Court of Appeal with instructions to remand to the trial court for a retrial on the issue of damages.

George, C. J., Baxter, J., Chin, J., and Moreno, J., concurred.

**WERDEGAR, J.,** Dissenting.—It has long been the rule in this state,[1] in other states,[2] and in federal court,[3] that when an owner enters into a construction contract with a builder or contractor, and the owner thereafter

---

[1] *C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 640 [218 Cal.Rptr. 592] (*Peterson*); *Daugherty Co. v. Kimberly-Clark Corp.* (1971) 14 Cal.App.3d 151 [92 Cal.Rptr. 120] (*Daugherty*); *Opdyke & Butler v. Silver* (1952) 111 Cal.App.2d 912 [245 P.2d 306] (*Opdyke*).

[2] See, e.g., *Greenlee County v. Webster* (1923) 25 Ariz. 183, 199 [215 P. 161, 166]; *H. T. C. Corporation v. Olds* (Colo.Ct.App. 1971) 486 P.2d 463, 466-467; *Baerveldt & Honig Const. Co. v. Dye Candy Co.* (1948) 357 Mo. 1072 [212 S.W.2d 65]; *Douglas Const. Inc. v. Marcais*

"imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered" (*Peterson, supra,* 172 Cal.App.3d at p. 640), the law provides the contractor a remedy. When such a situation arises in this state, the original contract is considered mutually abandoned and replaced with a new contract that allows the contractor to recoup its actual costs. (*Id.* at p. 645.) Whether labeled an "abandonment" of the contract or a "cardinal change,"[4] the doctrine is limited to the construction context. Albeit rarely invoked,[5] the doctrine operates as a safety valve for contractors to recover their actual costs for construction projects that, through no fault of their own, go out of control, far beyond the intention of the contracting parties.

Until today, no court, state or federal, has limited this doctrine only to contractors and builders that contract with a *private* owner. Nor, indeed, is this defendant City of Thousand Oaks' (the City) main argument, as the City primarily urges us to abolish the doctrine in its entirety.[6] Because the majority refuses to abolish the doctrine, yet fails adequately to explain why such a limit is justified by previous authority or supported by present policy concerns, I respectfully dissent.

I begin by setting forth the general rules applicable to public contracts. Public Contract Code section 20162, which is applicable to cities such as the City, provides that "[w]hen the expenditure required for a public project exceeds five thousand dollars ($5,000), it shall be contracted for and let to the lowest responsible bidder after notice." It is undisputed that plaintiff Amelco Electric (Amelco) participated in the bidding and was the lowest responsible bidder for the project at issue in this case.

Civil Code section 1635 is also relevant. It provides: "All contracts, whether public or private, are to be interpreted by the same rules, except as

(1997) 239 A.D.2d 803 [657 N.Y.S.2d 835]; *Hayden v. Astoria* (1915) 74 Or. 525, 533 [145 P. 1072]; *Rhodes v. Clute* (1898) 17 Utah 137 [53 P. 990].

[3]See, e.g., *Edward R. Marden Corporation v. United States* (Ct.Cl. 1971) 442 F.2d 364, 369-370; *Air-A-Plane Corporation v. United States* (Ct.Cl. 1969) 408 F.2d 1030; see also *Wunderlich Contracting Company v. United States* (Ct.Cl. 1965) 351 F.2d 956, 965-966 (finding no cardinal change).

[4]See generally 11 part 1 California Jurisprudence Third (1996) Building and Construction Contracts, section 21, pages 30-31 (abandonment); 13 American Jurisprudence Second (2000) Building and Construction Contracts, section 102, page 87 (same); Stein, Construction Law (1992) Modification of Construction Contracts, paragraph 4.02[3], page 4-7 (cardinal change); Keyes, Government Contracts Under the Federal Acquisition Regulation (2d ed. 1996) Contract Modifications, section 43.15, page 925 (cardinal change).

[5]Only three reported cases in California deal with the doctrine.

[6]The City in its briefing adopts a fallback position, arguing in the alternative that limiting the abandonment doctrine to private entities would also be satisfactory.

otherwise provided by this Code." This directive is consistent with prior case law, which holds that once the public bidding is over and the contract awarded, the "contract between a governmental body and a private party is to be construed by the same rules which apply to the construction of contracts between private persons [citation], and the public entity is bound in the same manner as an individual." (*Tonkin Construction Co. v. County of Humboldt* (1987) 188 Cal.App.3d 828, 831-832 [233 Cal.Rptr. 587]; see also *Souza & McCue Constr. Co. v. Superior Court* (1962) 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338] [holding the state "is liable for a breach of its agreement in like manner as an individual" and rejecting application of the doctrine of governmental immunity].)

The general rule applicable to construction contracts with public entities thus requires that we treat a public entity such as the City the same as any other contracting party once the public bidding process has terminated and a valid contract has been awarded. The majority's reliance on *Miller v. McKinnon* (1942) 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570] (maj. opn., *ante*, at p. 234) is thus inapposite, for in that case, the parties entered into the contract in question without competitive bidding, resulting in a contract that was *void at its inception*. By contrast, Amelco was the lowest responsible bidder, and that it had a valid contract with the City is undisputed.

As the majority recognizes, the general rule in California is that "[i]n the specific context of construction contracts, . . . when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of contract properly may be found. [Citations.] In these cases, the contractor, with the full approval and expectation of the owner, may complete the project. [Citation.] Although the *contract* may be abandoned, the *work* is not." (*Peterson, supra*, 172 Cal.App.3d at p. 640, citing *Daugherty, supra*, 14 Cal.App.3d 151, and *Opdyke, supra*, 111 Cal.App.2d 912.) Under these circumstances, an "[a]bandonment of a contract may be implied from the acts of the parties" (*Daugherty, supra*, at p. 156), and a contractor is not precluded from recovering the costs expended if it continues to perform the work (*id.* at pp. 156-157).[7]

---

[7]The majority misreads applicable precedent when it opines that "the Courts of Appeal have concluded that private parties may impliedly abandon a contract *when they fail to follow change order procedures* and when the final product differs substantially from the original." (Maj. opn., *ante*, at p. 235, italics added.) Although the failure to follow prescribed change order procedure is mentioned in the three California cases addressing the abandonment doctrine (*Peterson, supra*, 172 Cal.App.3d at p. 637; *Daugherty, supra*, 14 Cal.App.3d at p. 156; *Opdyke, supra*, 111 Cal.App.2d at p. 918), none of these cases describe such failure as a prerequisite to a finding the parties intended to abandon their construction contract. I thus

The legal basis for this rule is the recognition in law, that when a contractee's changes to a construction contract are so numerous and substantial that the contractor is no longer building the project the parties originally intended be built, fairness requires that the contractor be afforded a remedy. The basis of this remedy is not dependent on the private or public character of the contractee. Indeed, the majority cites no authority in this state or any other jurisdiction in this country that recognizes the public/private distinction in this context. In fact, the rule usually applied in this country leans in a direction contrary to the majority's rule here, for building contractors that enter into construction contracts with the federal government are afforded a remedy under the analogous cardinal change doctrine when the government "effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." (*Allied Materials & Eq. Co. v. United States* (Ct.Cl. 1978) 569 F.2d 562, 563-564.) Of course, all federal cases applying the federal cardinal change doctrine involve a public entity as the contractee, namely, the federal government.

Setting aside the majority opinion's complete absence of supporting legal precedent, I am also unpersuaded by the majority's sole supporting rationale that permitting Amelco to recover against a public entity will render competitive bidding laws "meaningless." (Maj. opn., *ante*, at p. 239.) Although circumvention of competitive bidding laws is a concern, no facts in this case suggest Amelco somehow evaded the applicable competitive bidding laws. Instead, viewing the facts in a light favorable to Amelco, the prevailing party below (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427]), it appears the City let the project out for bid before its plans were sufficiently complete to permit knowledgeable and informed bidding by building contractors, placed itself under an unreasonable time pressure by booking entertainment into the new facility without allowing a reasonable amount of time to complete the project, and then

agree with the Court of Appeal below when it stated: "[In prior cases,] the parties also ignored contractual change order procedures and were unable to keep accurate cost records. These facts, however, are not essential elements of an abandonment claim. Instead, they are evidence that the number of changes made to a project was excessive and beyond the original intent of the parties. These facts support a finding of abandonment; they are not essential to it."

In any event, whether or not Amelco reserved the right to seek additional compensation despite partial attempts to utilize the contractual change order procedure, and whether or not the City acceded to those attempts, was a hotly contested issue at trial. Viewing the facts in a light favorable to the prevailing party below, as we must, the evidence showed, as the Court of Appeal stated, that the parties deviated from the contract's change order procedure by performing many changes on a "price and proceed" basis, with Amelco reserving the right to seek additional compensation later, rather than following the procedure described in the contract.

imposed numerous and substantial changes to the project while giving Amelco no extra time to complete the additional work. As the Court of Appeal noted, "there was substantial evidence that City abandoned the contract by changing every aspect of the electrical work. City issued 1,018 detail sketches changing, clarifying or correcting the original contract drawings. Two hundred and thirteen of these were electrical sketches and at least 248 directly impacted Amelco's work. None of the witnesses, including two of City's expert witnesses, had ever been involved in a project with as many sketches as this one." "By the time construction was completed, City had changed *every part of the electrical work at least once*," in one room alone making more than 40 changes. The concern that allowing recovery under the abandonment doctrine might improperly reward a contractor that circumvented bidding procedures designed to protect the public from fraud is not implicated by the facts of this case.

Moreover, the majority's argument that applying the abandonment doctrine against a public entity like the City "would encourage contractors to bid unrealistically low, with the hope of prevailing on an abandonment claim," (maj. opn., *ante*, at p. 240) is fallacious. To believe a contractor would deliberately submit an abnormally low bid in hopes of obtaining a job and, once obtaining it, would expend the time and expense of completing it, with the intention of thereafter incurring the high cost—in dollars, delay and inconvenience—of modern litigation to recoup several years later its additional expenses, defies common sense. Such a hypothetical contractor, moreover, would also have to hope the public entity would make so many substantial changes to the original project that a plausible claim of abandonment could be made. Were insufficient changes imposed, the contractor would simply be left to bear the losses of its below-market bid. The dearth of cases asserting abandonment (see fn. 5, *ante*) bespeaks the difficulty of establishing it. The majority's argument ignores practicality.

Contrary to the majority's view that recognition of the abandonment doctrine in the context of public contracts would compromise the public welfare, the doctrine may be seen actually to benefit the public. First, its recognition would deter public entities from prematurely putting a project out to bid, motivating them instead, as the Court of Appeal reasoned, first to determine what they want built, with adequate plans and specifications so that intelligent competitive bidding can take place. By this, the public as well as the contracting agency and contractors would benefit. Second, its availability would allow a contractor faced with a project whose very character has been altered by excessive changes to finish the project (clearly in the public interest) and recoup its actual cost, rather than the alternative, which would be to stop building, thereby requiring the public agency to draw

up plans, allow for new bidding and award a new contract, with all the delays and increased costs attendant thereto.

The majority also purports to find "significant public policy concerns" (maj. opn., *ante*, at p. 240) in the fact that Amelco cannot pinpoint the exact time and date the contract was abandoned. This argument has two answers. First, the majority's concern betrays a misunderstanding of the abandonment doctrine itself, for unlike the traditional doctrine of abandonment in which both sides to a contract expressly announce their intention to abandon it, releasing both sides from their respective duties under the contract (also called mutual rescission; see *Pennel v. Pond Union School Dist.* (1973) 29 Cal.App.3d 832, 837-838 [105 Cal.Rptr. 817]), abandonment in the construction context is different, both because the contractor is not released from the obligation to complete the project, and because an abandonment in the construction context results from the aggregation of numerous changes to the contract over time, and not at an identifiable moment in time.

The difference was explained in *Peterson*, *supra*, 172 Cal.App.3d at page 640: "[Traditional] abandonment [of a contract] may start with an intent to abandon by one or both of the contracting parties and conclude with an agreement by each that the contract is terminated and of no further force and effect. Using this analytical approach, completion of the contract would be inconsistent with a holding that a contract was abandoned. [¶] In the specific context of construction contracts, however, it has been held that when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of contract properly may be found. [Citations.] In these cases, the contractor, with the full approval and expectation of the owner, may complete the project. [Citation.] Although the *contract* may be abandoned, the *work* is not."

Second, the majority's concern over the absence of a specific time and date of abandonment goes to the viability of the doctrine itself, and not just to its application to public entities. Thus, it is not only public entities that "would not receive timely notice of claims that would allow them to make project management, budget, or procedural adjustments during the course of construction." (Maj. opn., *ante*, at p. 240.) Private parties also would lack such notice. The majority's concern in this regard thus does not advance its proposition that the abandonment doctrine should be limited to private contractees.

The only plausible support for the majority's conclusion is Public Contract Code section 7105, subdivision (d) (hereafter section 7105(d)). That

statute provides: "(d) (1) Where authority to contract is vested in any public agency, excluding the state, the authority shall include the power, by mutual consent of the contracting parties, to terminate, amend, or modify any contract within the scope of such authority. [¶] (2) Paragraph (1) shall not apply to contracts entered into pursuant to any statute expressly requiring that contracts be let or awarded on the basis of competitive bids. *Contracts of public agencies, excluding the state, required to be let or awarded on the basis of competitive bids pursuant to any statute may be terminated, amended, or modified only if the termination, amendment, or modification is so provided in the contract or is authorized under provision of law other than this subdivision.* The compensation payable, if any, for amendments and modifications shall be determined as provided in the contract. The compensation payable, if any, in the event the contract is so terminated shall be determined as provided in the contract or applicable statutory provision providing for the termination." (Italics added.)

The provision in section 7105(d) limiting "terminations" of public contracts that are subject to competitive bidding laws would apply here if, by "termination," the statute means to include "abandonment." But that the Legislature meant to include abandonment of a construction contract is not evident. Certainly the plain meaning of the word "terminations," as used in section 7105(d), does not clearly embrace "abandonment," which is more akin to a mutual rescission. All three California cases relying on the abandonment doctrine in the construction context (*Peterson, supra,* 172 Cal.App.3d 628; *Daugherty, supra,* 14 Cal.App.3d 151; *Opdyke, supra,* 111 Cal.App.2d 912) preceded the earliest version of section 7105(d) by several years (see Stats. 1990, ch. 694, § 6, pp. 3261-3263 [adding Pub. Contract Code, former § 7104, subd. (d)]), a sequence suggesting the Legislature did not intend "termination" and "abandonment" to be synonymous. Had the Legislature desired to affect the abandonment of a public construction contract, knowing as it must have that applicable appellate opinions dealing with construction contracts spoke in terms of an "abandonment," in distinction from a "termination," it could readily have used the word "abandonment." (See *People v. Superior Court (Lavi)* (1993) 4 Cal.4th 1164, 1178-1179, fn. 9 [17 Cal.Rptr.2d 815, 847 P.2d 1031] [Legislature presumed to be aware of existing case law].) As the Court of Appeal correctly observed, there is a presumption that statutes do not, by implication, repeal established common law rules; thus, a statute generally will be construed to avoid conflict with the common law. (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297 [65 Cal.Rptr.2d 872, 940 P.2d 323].) Because Public Contract Code section 7105 does not expressly repeal the established common law rule that the contractual liability of a public agency is the same as that of a private individual, we should

not presume it was intended to do so. Accordingly, I conclude that section 7105(d) does not require reversal in this case.

There being no authority or persuasive reason to prohibit application of the abandonment doctrine to construction contracts with public entities, I dissent.

Kennard, J., concurred.

Respondent's petition for a rehearing was denied March 13, 2002. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.