**Otilio ROMERO, Plaintiff–Appellee,**

v.

**CINCINNATI INCORPORATED,
a corporation, Defendant–
Appellant.**

**No. 98–2303.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1998.

Decided March 22, 1999.

Donald X. Murphy (argued), Chicago, IL, for Plaintiff–Appellee.

Lawrence Helms (argued), Swanson, Martin & Bell, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and RIPPLE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In this products liability case, brought under the diversity jurisdiction, a jury awarded Otilio Romero $450,000 in damages for a serious injury he sustained when his hand was crushed by a press brake manufactured by Cincinnati Incorporated. Cincinnati appeals from the denial of its motion for judgment as a matter of law or alternatively for a new trial. The law of Illinois governs this case.

In 1989, when the accident occurred, Mr. Romero had been employed for only a few months by Remcor Products Company, Inc. at a facility in Glendale Heights, Illinois. He operated a multi-purpose press brake, which is a hydraulic machine for forming sheet metal into shapes dictated by dies placed in the machine. The press brake is used on a wide range of sheet metal, from pieces which are quite small to sheets of metal 6 feet long and 1/8-inch thick. The versatility of the machine depends on its two control panels—one has over 75 dials which are used to set the machine to do various functions. Each time a different project is begun, the machine must be reset by a person trained to do it. As an operator, Mr. Romero would not be the person who would set up the machine.

After the machine is set up the operator places sheet metal in the machine and activates the press brake so that a metal ram descends and a die presses the metal into the desired shape. The point at which the die hits the metal is called the "point of operation." The machine is placed into operation by either palm switches or a foot switch, but not both; i.e., when the palm switches are being used, the foot switch must be turned off and vice versa. Because there are two palm switches, the use of these switches requires that both of the operator's hands be employed in activating the machine. Use of the palm switches, then, ensures that the operator's hands will be safely out of the way, i.e., not in the point of operation. However, the machine is operated about 80 percent of the time with a foot pedal and, as might be expected, a foot pedal leaves the operator's hands free and, if no safety devices prevent it, free to accidentally be under the ram when it descends. This is what happened to Mr. Romero. He was feeding a relatively small piece of metal (about 1/2-inch wide and a foot long) into the machine when his hand was caught under the ram.

To prevent injury there are several safety devices which can be installed on a multipurpose press brake. One problem is, though, that because the machine is used for several different purposes with different sizes of sheet metal, at least some of the devices will not work with some of the operations. One device is a light curtain, which is a beam of light which when broken will cause the machine to stop. Because sometimes the metal being shaped necessarily interferes with the light curtain—it will break the beam—the light curtain has a "mute point." This is the point at which the machine is set to ignore the break made in the light curtain by the material passing through the light device. Another safety device is a moveable barrier which descends prior to the descent of the ram. If the barrier strikes an object underneath the ram, it stops the die from descending. Fixed barriers are also available. Safety devices called restraints are cords which attach to the wrists of the operator to prevent the extension of the

hands into the point of operation. Similarly, pullbacks are wristlets that the operator wears. They are attached to a cord which automatically pulls the operator's hands back from the point of operation. As we said, the Cincinnati press brake on which Romero was injured was not fitted with safeguards which would protect the operator when the foot pedals were being used.

After he was injured Romero sued Cincinnati, and the case went to jury trial on his claim that the press brake was unreasonably dangerous because it did not have adequate safeguards at the point of operation and because the user was not warned against using a foot pedal without safeguards which would protect the operator's hands. A claim brought in negligence was withdrawn at the close of the plaintiff's case. The jury found for Mr. Romero, and the court denied Cincinnati's motions for judgment as a matter of law or for a new trial. Cincinnati appeals, contending (1) that Romero failed to present legally sufficient evidence that the product was unreasonably dangerous and thus the district court erred in denying its motion for judgment as a matter of law; (2) that the verdict was against the manifest weight of the evidence and the district court erred in not granting a new trial; and (3) that the district court abused its discretion in instructing the jury on a nondelegable duty to guard the point of operation when Cincinnati never asserted that it delegated its duty to another entity.

■ We consider Cincinnati's first claim, urging error in the denial of its motion for judgment as a matter of law, against a federal standard of review. *Mayer v. Gary Partners and Co.*, 29 F.3d 330 (7th Cir.1994). We ask what Romero had to prove under Illinois law and decide, applying the federal reasonable person standard, whether he accomplished his goal. If reasonable persons could find for Romero, viewing the evidence favorably in his direction, Cincinnati's motion for a judgment as a matter of law was properly denied. Our review is *de novo*. *Deimer v. Cincinnati Sub–Zero Products, Inc.*, 58 F.3d 341 (7th Cir.1995).

■ Under the substantive law of Illinois, in order to prevail on a cause of action in strict liability a plaintiff must establish that (1) the defendant was engaged in the business of selling the product; (2) the plaintiff was injured by a product that is in an unreasonably dangerous condition; and (3) that the condition existed at the time the product left the manufacturer's control. *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965), *over'd on other grounds*; *Dixon v. Chicago & North Western Transp. Co.*, 151 Ill.2d 108, 176 Ill.Dec. 6, 601 N.E.2d 704 (1992); *Doyle v. White Metal Rolling and Stamping Corp.*, 249 Ill.App.3d 370, 188 Ill.Dec. 339, 618 N.E.2d 909 (1993).

■ A plaintiff may show that the product is defective in design by showing (1) that the "product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" or (2) that the "design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs." *Lamkin v. Towner*, 138 Ill.2d 510, 150 Ill.Dec. 562, 563 N.E.2d 449, 457 (1990).

■ The failure to provide a necessary safety device or the failure to warn potential users about a product's dangerous propensities can render a product unreasonably dangerous. *Monreal v. Waterbury–Farrel Foundry & Mach. Co.*, 269 Ill.App.3d 841, 207 Ill.Dec. 250, 646 N.E.2d 1337 (1995). Evidence of a defendant's compliance with a federal regulation or an accepted standard is relevant, but it is not a conclusive defense to a claim that the product is unreasonably dangerous. *See Schwartz v. American Honda Motor Co.*, 710 F.2d 378 (7th Cir.1983), applying Illinois law.

In regard to the defective design, Cincinnati's attack goes to the evidentiary foundation of Romero's case. Without be-

ing very specific about what a prima facie case involves, relying on *Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill.App.3d 821, 145 Ill.Dec. 810, 557 N.E.2d 580 (1990), Cincinnati contends that in order to prove his case, Romero was required to present expert testimony. It is Romero's expert on whom Cincinnati concentrates its attack. While Cincinnati acknowledges that Romero did present an expert, Walter Villiers, Cincinnati claims that his testimony was self-contradictory and wholly unsupported by the evidence to the point that it was legally insufficient evidence to support the claim; it could not establish a prima facie case, say nothing of allowing a reasonable jury to find in Romero's favor.

Our examination of the testimony leads us to conclude that it was not so weak as Cincinnati contends. First of all, Cincinnati itself made no challenge to Mr. Villiers' qualifications as an expert. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Secondly, the alleged internal contradictions in the testimony are not so egregious as Cincinnati claims. For example, at one point, Villiers testified that the press brake was unreasonably dangerous because there were no safeguards on it. Later, he acknowledged that the palm buttons were, in effect, a safety device because if the palm buttons were used the operator's hands could not have been at the point of operation and thus the palm buttons were a safety device. It is not unreasonable for a jury to reconcile those two bits of testimony; indeed, we have no trouble doing so. When the foot pedal was being used the palm buttons could not be operative, in which case there would be no safety device in operation on the machine.

Cincinnati also attacks Villiers' testimony in regard to the duty to provide safeguarding. The company points out that Villiers admitted that the American National Standards Institute (ANSI) publication was the sole industry standard for press brakes. In Cincinnati's view, Villiers said that ANSI B11.3 placed the responsibility of point-of-operation guarding on the employer, thus apparently undermining Romero's case. We note, however, that Villiers read part of the following passage from the forward to ANSI B11.3:

> The primary objective of this standard . . . is to prevent injuries to personnel associated with power press brake activities by establishing realistic requirements for the construction, care, and use of press brakes. . . .

He then said that "construction" is done by the manufacturer. Even were we to agree that Villiers' testimony was less than compelling, the jury was free to accept his interpretation of the standards. And in any event, compliance with applicable standards is not controlling. The evidence is "relevant, though not conclusive, in a products liability case." *Schwartz v. American Honda*, 710 F.2d at 383.

The opinion stated by Villiers which Cincinnati labels "utterly untenable" refers to what seems from the transcript of the testimony to have been an offhand remark, which was later abandoned. While he was being asked about possible safety devices which might have been incorporated into the machine, Villiers said "it could have a sweeping device." On cross-examination he acknowledged that sweep devices were outlawed by the Occupational Safety and Health Administration. He explained that he said merely that a sweep device could be a safety device. The jury heard the testimony and could reasonably conclude that Villiers was not recommending a sweep device but, rather, casually acknowledging its existence.

All in all, although Villiers' testimony may not be the strongest we have seen, we see no fatal deficiency in it. Cincinnati's expert did not agree with Mr. Villiers. That is not surprising. This is a battle of the experts, a battle which Cincinnati lost before the jury. *See Monreal.* We cannot say that reasonable persons, viewing the evidence presented in the light most favorable to Romero's claim, could not have reached a verdict in his favor. Accordingly, the Rule 50 motion was properly denied.

Alternatively, Cincinnati contends that its motion for a new trial, pursuant to Rule 59, should have been grant-

ed. A new trial is granted if the verdict is against the manifest weight of the evidence or if a prejudicial error occurred. *Davlan v. Otis Elevator Co.*, 816 F.2d 287 (7th Cir.1987). Even if error was committed, no new trial is required if the error was harmless. *Harris v. Davis*, 874 F.2d 461 (7th Cir.1989); Rule 61, Federal Rules of Civil Procedure.

As our earlier discussion should already have made clear, the verdict in this case is not against the manifest weight of the evidence. We also see no trial errors which require a new trial. Errors alleged to have prejudiced Cincinnati include evidence about what is referred to as a "mute point." As we said before, the term "mute point" applies to the point at which a light curtain beam no longer will stop the operation of the machine. The term is relevant only when there is a light curtain on the machine. The machine in question did not have a light curtain. What happened at trial is that the term "mute point" was used by a fellow named Carl Steinke, who at the relevant time was the superintendent of sheet metal at Remcor, when he was actually referring to a "stroke stop." If the machine is set to use a stroke stop, the ram will descend to within a couple of inches of the point of operation; but it will not continue the remainder of the way until the foot pedal is engaged a second time. In our opinion, what is revealed by the testimony is confusion over the operation of the press brake and over what Cincinnati told Steinke when the machine was installed. This is not in any real sense testimony about a "mute point." What a jury could conclude from Steinke's testimony is that Cincinnati did not clearly explain to him anything about safety devices.

Cincinnati's other claim of error is that evidence that it did properly instruct Remcor personnel about the machine is relevant only to a negligence theory; the negligence claim was withdrawn, and therefore the admission of the testimony was prejudicial. We do not find this argu-

ment convincing, especially because at least some of the testimony was in evidence before the negligence claim was withdrawn at the close of Mr. Romero's case.

Finally, Cincinnati contends that the court abused its discretion in instructing the jury that Cincinnati had a nondelegable duty to manufacture a reasonably safe product. Cincinnati argues that it never contended that it could delegate that duty to Remcor and that therefore the instruction was improper. It is clear, however, that Cincinnati argued vigorously at trial that the installation of appropriate safeguards was Remcor's responsibility. The first statement made by Cincinnati's counsel during closing arguments was "Remcor was responsible for safeguarding the point of operation. Remcor failed to do so, that's the sole cause of the accident." We see no abuse of discretion in the use of this instruction. The judgment of the district court is AFFIRMED.