**BRAUN ELEVATOR COMPANY,**
Plaintiff,

v.

**THYSSENKRUPP ELEVATOR
CORPORATION,**
Defendant.

No. 04–C–439–S.

United States District Court,
W.D. Wisconsin.

May 16, 2005.

Anne Willis Reed, for Plaintiff.

Joseph S. Goode, Madison, WI, for Defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

This action for breach of contract and violation of the California Equipment Dealers Act (CEDA), Cal. Bus. & Prof Code § 22900, et. seq., was tried to a jury, which returned a verdict in Plaintiff's favor for $7,490,400. Judgment was entered accordingly. Defendant now moves for judgment as a matter of law or alternatively for a new trial on all of the issues resolved in plaintiff's favor at trial. Plaintiff contends that the verdict was fully supported by the evidence at trial and that no errors of law support judgment as a matter of law in defendant's favor, or a new trial. Plaintiff also seeks its attorney's fees based on its having prevailed on its CEDA claim. The

following is a summary of the evidence and proceedings at trial relevant to the motions.

## BACKGROUND

Plaintiff is in the business of selling and servicing elevators in Wisconsin. Defendant is a California manufacturer of elevators. During the relevant time the parties operated under a Distributor Sales Agreement which included the following provisions:

> This agreement between Thyssen Elevator Corporation... and Braun Elevator Company ... is intended to define an understanding between the parties under which the distributor · agrees to market, install, and make available maintenance and repair services for the products of TEC (both new installation and alteration products).
>
> Should new affiliated manufacturing companies become part of the Thyssen Elevator Group, it would be expected that the distributor would also distribute their products if a similar or competing product is being sold by the distributor...
>
> Nothing in this agreement prohibits TEC from selling components or spare parts to major or otherwise qualified companies. This does, however, not include the sale of any proprietary parts or components to others in the distributor's territory...
>
> The responsibilities of the parties under this agreement will be as follows:

*TEC agrees to:*

> .   .   .   .   .
>
> 8. Supply products in the regular course of business at terms as favorable as any other distributor of TEC products. This does not preclude TEC from giving special job pricing for their own strategic reasons.

> 9. Utilize the above named distributor as the sole outlet of TEC products within the specified distribution area for as long as this agreement remains in effect and will not sell systems directly or through others unless the distributor does not bid a project that TEC wants to bid, or this agreement is no longer in effect.

> .   .   .   .   .

*Parties mutually agree:*

> 1. Not to solicit any existing clients of the other party...

*Distributorship Area of Coverage*

> The distributor will be authorized to market the products of TEC and its affiliates within [Wisconsin] for so long as this agreement remains in effect, or as stipulated elsewhere in this agreement. TEC will not sell or offer for sale its packaged product line to any other distributor organization during the duration of this agreement.

*Term of Agreement*

> .   .   .   .   .
>
> Thyssen Elevator Corporation reserves the right to purchase any existing organization within the market area delineated by this agreement, and to distribute TEC products through that purchased organization after acquisition has been completed. In the event of such an occurrence, either party to this agreement may elect not to extend its term, and the distributor will have the right to elect early termination. TEC will agree to fulfill the term of this agreement, with equipment prices at levels consistent with those offered prior to purchase of said organization, provided all responsibilities described herein continue to be fulfilled...

In November 1998 defendant entered into an agreement to purchase Dover Elevator Company, which at that time had no Wisconsin sales offices. In December 1998, prior to the closing of the purchase agreement Dover leased office space in Madison, Brookfield and Green Bay, Wisconsin. In February 1999 defendant began selling the newly acquired Dover elevator product line and other Thyssen products from the Wisconsin offices in competition with plaintiff.

Thereafter defendant offered only a portion of its evolving product lines to plaintiff and offered them at a higher cost than the products provided to its own distributors. The branch offices also competed with plaintiff for service contracts with elevator purchasers. The parties disputed whether this conduct was a violation of the terms of the Distributor Sales Agreement.

The parties agreed that the matter was governed by California law and defendant proposed the following several standard jury instructions approved by the Judicial Counsel of California which the Court provided to the jury:

## INTERPRETATION—MEANING OF ORDINARY WORDS

You should assume that the parties intended the words in their contract to have their usual and ordinary meaning unless you decide that the parties intended the words to have a special meaning.

## INTERPRETATION—MEANING OF TECHNICAL TERMS

You should assume that the parties intended technical words used in the contract to have the meaning that is usually given to them by people who work in that technical field, unless you decide that the parties clearly used the words in a different sense.

## INTERPRETATION—CONSTRUCTION OF CONTRACT AS A WHOLE

In deciding what the words of a contract meant to the parties, you should consider the whole contract, not just isolated parts. You should use each part to help you interpret the others, so that all the parts make sense when taken together.

## INTERPRETATION—CONSTRUCTION BY CONDUCT

In deciding what the words in a contract meant to the parties, you may consider how the parties acted after the contract was crated but before any disagreement between the parties arose.

At the conclusion of the liability phase of the bifurcated trial, the jury returned a verdict finding that defendant breached the contract in the following ways:

(1) by selling products in Wisconsin through its Wisconsin branch office;

(2) by selling services in Wisconsin through its Wisconsin branch office;

(3) by not making all products that it manufactured available to plaintiff;

(4) by charging higher prices to plaintiff for the same or similar products than it charged to its branch office in Wisconsin;

(5) by failing to provide available technical and marketing support to plaintiff;

(6) by soliciting plaintiff's customers;

(7) by breaching its implied duty of good faith and fair dealing.

The jury also determined that defendant substantially changed the competitive circumstances of the dealer agreement in violation of CEDA.

## MEMORANDUM

In considering a motion for judgment as a matter of law pursuant to Rule 50(b) the court determines whether the evidence

presented, viewed in the light most favorable to the prevailing party and combined with all reasonable inferences that may be drawn in favor of the prevailing party, is sufficient to support the verdict. *Tennes v. Massachusetts Dept. of Revenue,* 944 F.2d 372, 377 (7th Cir.1991). The Court does not reevaluate the credibility of witnesses nor otherwise weigh the evidence. *Id.* A new trial may be granted pursuant to Rule 59 if the verdict is against the weight of the evidence or for some other reason the trial was not fair to the moving party. *Forrester v. White,* 846 F.2d 29, 31 (7th Cir.1988).

*Liability Verdict*

■ In its first argument, defendant contends that as a matter of law it had a contractual right to compete with plaintiff in Wisconsin in the sale of products and services and had the right to solicit plaintiff's customers by virtue of its acquisition of Dover. More specifically, defendant contends that its acquisition of Dover was the acquisition of an "existing organization within the market area delineated by this agreement" such that it was authorized to compete with plaintiff in Wisconsin through Dover in products, services and existing customers. Plaintiff contends that the term "existing organization" is ambiguous and was properly resolved in its favor by the jury at trial.

The question of the meaning of the ambiguous phrase "existing organization" was properly before the jury with the instructions submitted and approved by defendant. Notwithstanding that the facts concerning the Dover acquisition were well known prior to trial, defendant did not seek a summary judgment ruling on the issue nor did it propose a jury instruction on the meaning of the term. In fact, defendant opposed any such instruction or an instruction that the jury was not to interpret unambiguous terms. Transcript at 2–166. Defendant cannot be heard to complain now that the jury improperly interpreted the term.

Furthermore, had the issue been presented to the Court for its interpretation it would have reached the same result as that apparently reached by the jury. The only reasonable interpretation of the phrase "existing organization within the market area" is that the existing organization must be competing in the market area at the time of acquisition. To hold otherwise would render the phrase "within the market area" meaningless and would permit the defendant to readily circumvent the exclusivity provisions as it attempted to do. Dover clearly was not competing in Wisconsin at the time of acquisition and therefore its acquisition did not permit competition in Wisconsin.

■ Defendant next argues that the jury verdict finding breach by the sale of services should be negated because as a matter of law the agreement did not encompass services. To the contrary, the language of the contract, as properly determined by the jury, evidences a clear intent to grant plaintiff the exclusive right to sell as well as service defendant's elevators. The initial paragraph of the agreement expresses the understanding that plaintiff will undertake the sale, "maintenance and repair services" for defendant's products. The fourth paragraph of the agreement provides that "Sales of spare parts of any kind to be used in modernization, repair and maintenance operations within the distributors territory, exclusive of 'private label' components shall be referred to the distributor." Page three, numbered paragraph 5 requires defendant to assume responsibility for "all activities associated with the installation and service of products provided under this agreement." Considering the agreement as a whole there is no doubt that plaintiff's had the right under the agreement to be the

exclusive distributor of elevator systems, parts and service in its territory.

In a similar vein, defendant's third argument is that as a matter of law and under any reasonable view of the facts the contract did not require defendant to make newly acquired Dover products available to plaintiff or to offer products at the same prices it offered its own dealers. The Court now finds the jury verdict amply supported by the evidence and consistent with a proper interpretation of the contract. Concerning the first issue the contract provides plaintiff with the exclusive right to sell "TEC products". Pursuant to the first paragraph of the agreement "TEC" means Thyssen Elevator Company *and* its affiliates. Accordingly, upon acquisition Dover became an affiliate and its products became subject to the agreement. However, the agreement recognized that a new acquisition could significantly alter the relationship and therefore made certain additional agreements relating to such acquisitions. First, that plaintiff had the right to refuse to take on the new products subject to defendant's right to terminate the agreement. Second, that if the newly acquired company had a sales presence in the territory defendant could compete with plaintiff to that extent.

As a matter of fact it is apparent that such an interpretation is entirely reasonable. It was established at trial that shortly after acquisition defendant began to combine and alter product lines and manufacturing operations, making it increasingly difficult to distinguish between the former Dover line and what became a TEC line. It is reasonable that the parties would provide, as they did, that all TEC lines, including those newly acquired, would be subject to the agreement. This agreement is expressly reflected in the contract language. The recitations affirm what would be the correct contract interpretation even in their absence.

■ Considering the matter of pricing, the agreement requires defendant to "supply products in the regular course of business at terms as favorable as any other distributor of TEC products." It was undisputed at trial that defendant had supplied TEC products for 15% less than the price it offered to plaintiff to both its own Wisconsin distributors and the former Dover distributors who became TEC distributors after the acquisition. Accordingly, the jury's finding of liability for overcharging was amply supported, indeed compelled by the facts. Defendant argues that its own distributors fall outside the term "any other distributor." While defendant's interpretation is perhaps plausible, the meaning of "any other distributor" is ambiguous and may reasonably have been interpreted to include defendant's branches competing in plaintiff's territory.

Regardless of the interpretation there is no rational basis to exclude the independent (formerly Dover) distributors from the definition. Defendant argues that these distributors cannot be considered because they were not known at the time of the original agreement. However, the circumstances leave little doubt the parties contemplated new distributors might be added after the agreement was signed and understood new distributors were not to receive better prices than plaintiff.

Finally, defendant contends that the Court was wrong to ask and the jury wrong to conclude that defendant is liable for breaching a contractual duty of good faith under California law. The jury's breach of contract verdict and this Court's affirmation of it renders the issue moot. All evidence presented at trial and all damages evidence related to other specific contract breaches. The *good faith* question might have become relevant had the jury concluded, for example, that defendant's actions in causing Dover to lease office

space on the eve of the merger closing, while technically permitting them to compete, was an improper circumvention of the exclusivity agreement in violation the implied covenant of good faith. Such behavior might have constituted an effort to gain an opportunistic advantage in a way not contemplated by the parties at the time of drafting. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990). However, because the jury found a breach of all relevant contract provisions for which damages were sought, the answer to the good faith and fair dealing question has no consequence.

■ Defendant also challenges as against the weight of the evidence the jury's verdict that defendant substantially changed the competitive circumstances of the dealer agreement. Defendant's argument has three parts. First, that its actions were permitted by the terms of the dealer agreement and therefore could not qualify as a substantial change under the law as provided the jury in the instructions. This argument fails under the preceding analysis sustaining the jury's breach of contract determinations.

Defendant's second argument is that no evidence supported the jury's finding that substantial change in competitive circumstances occurred *after* November 26, 2000 as found by the jury. The actions that defendant took—introducing new competition, discriminatory pricing and restriction of access to new product lines—are recognized "changes in competitive circumstances" because they make intra-brand competition by the dealer more difficult. *See Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1240–41 (7th Cir.1986). Pursuant to the approved instruction provided to the jury, the change must also be substantial in the sense that it has a significant adverse effect on the dealer's ability to compete. The evidence at trial was that

changes began over a period of time beginning with the acquisition of Dover in early 1999. However, the evidence amply supported the finding that their actual imposition and their significant effect on defendant occurred after November 26, 2001.

Defendant's suggestion that it was plaintiff's obligation to "pinpoint an actual date for the substantial changes" is inconsistent with the reality of the creeping nature of the changes imposed by defendant. The evidence at trial suggested that initial changes had relatively little impact on plaintiff's ability to compete effectively, but that the severity of the change and the effect on plaintiff's ability to compete steadily grew over time. Under these circumstances it is impossible to "pinpoint" the moment when the changes became a substantial change in competitive circumstances. The issue was one of fact to be gleaned from all the evidence—a task which the jury performed appropriately. To hold otherwise would permit an opportunistic grantor to circumvent the statute's restriction by slowly, and at first insubstantially, eroding the rights of the dealer only to escalate the effects later when the statute of limitations had passed based on initial insubstantial changes.

Defendant is also incorrect to suggest that the effect of its actions on plaintiff is irrelevant to the issue of when a substantial change occurred. As the jury was properly instructed, a claim does not exist until plaintiff can demonstrate that it was affected in a significant way in its ability to compete. Indeed, the Court in *Remus* has suggested that at a minimum a claim requires proof of "substantially adverse though not lethal effects." 794 F.2d at 1241. The evidence does not suggest that this threshold was approached prior to November 26, 2000. The jury's determination that a substantial change in competitive circumstances occurred after Novem-

ber 26, 2000 was amply supported by the trial evidence.

For similar reasons, defendant's suggestion that the circumstances required the Court to break down discrete acts and ask separately whether any single act constituted a substantial change would have been inappropriate. When the defendant is accused of engaging in a coordinated sequence of conduct designed to appropriate a dealer's rights under a dealership agreement for itself, the conduct is properly assessed as a whole to determine whether it effected a substantial change in competitive circumstances. The question was appropriate and the answer was fully supported by the evidence.

*Damages Verdict*

■ Defendant seeks a new damages trial arguing that the trial was unfair and the damages unsupported and excessive. Defendant's unfairness argument relates to plaintiff's use of defendant's holding company financial statements. Defendant conceded prior to trial that the financial statements were admissible, subject only to a possible objection based on relevance. Accordingly, defendant's objection at trial, and its argument now is based exclusively on the position that the financial statements are irrelevant. There is little question that the financial statements are relevant in several important respects.

Defendant opposed plaintiff's lost profit assessment on the basis that its Wisconsin branch offices had been unprofitable. Unlike plaintiff, however, defendant's branch offices were not distinct entities. Expenses attributed to the branches were generated at regional and corporate offices. The pricing of products and services were internal accounting transactions rather than market transactions and had the effect of shifting profit from branch offices to manufacturing. Accordingly, evaluating the profitability of the branches (an issue

raised by defendant) required consideration of the combined financial statements.

The financial statements were also relevant to the defendant's contention that it would not have sold products to plaintiff at the lower prices. The profitability of the elevator manufacturing operation was persuasive evidence that defendant would have sold to plaintiff at the lower prices to secure market share and reap the manufacturing profit. In truth, defendant's argument is based on alleged unfair prejudice from the disclosure of its corporate wealth, an argument under rule 403 which defendant waived. Nevertheless, even were the Court to perform Rule 403 balancing the probative value of the joint financial statements far outweighed their potential for unfair prejudice.

■ The defendant attacks the amount of past and future damages determined by the jury as monstrously excessive and not rationally connected to the evidence. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990). Defendant also contends that the failure to ask separate damage questions for each contract breach was contrary to California law and requires a new trial. Additionally, notwithstanding the absence of a pretrial *Daubert* motion, defendant suggests that plaintiff's expert's methodology was so flawed that it could not sustain the verdict. Defendant challenges separately the sufficiency of the evidence to support past and future damages.

Considering first the form of the damages special verdict, defendant's requested verdict form would have been practically unreasonable. Plaintiff's damages were for lost profits relating to lost sales. It would be virtually impossible to discern the share of lost sales related distinctly to unavailable product, unlawful competition from defendant, lack of marketing support or inflated product pricing. In fact, these

factors would not operate independently but would combine to reduce sales. The needlessly complex effort to assign an amount of sales to a particular factor would have been both impractical and irrelevant. For example, lost product sales surely resulted from the fact that defendant was improperly competing *and* competing with a 15% price advantage. None of the sales would have been lost absent the competition, but even with the competition some would not have been lost but for the discount. There would be no benefit from an attempt to assign lost sales to one factor or another.

Not surprisingly, California law does not require such a verdict. The cases defendant cites stand for the unremarkable proposition that there must be a causal connection between a contract breach and the damages that flow from the breach. *See St. Paul Fire and Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.*, 101 Cal.App.4th 1038, 1061, 124 Cal. Rptr.2d 818 (2002); *Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228, 243, 38 P.3d 1120, 115 Cal.Rptr.2d 900 (2002) (discussing the "total cost method" of contract damages). Neither case suggests that where multiple breaches combine to cause lost sales the jury must match particular lost sales to particular breaches, an exercise which in many instances will be impossible because intertwined breaches combine to cause lost sales.

■ Defendant challenges the methodology of plaintiff's expert in calculating future damages. Plaintiff first contends that such a challenge is precluded because defendant failed to make a pretrial *Daubert* objection to the proffered exert testimony. Courts have rejected post trial evidentiary challenges to an expert's methodology, even when characterized as a challenge to the sufficiency of the evidence, on the basis that the failure to object prior to the admission of the evidence deprived the proponent of the opportunity to offer additional foundation for the reliability of the expert's methodology. *Macsenti v. Becker*, 237 F.3d 1223, 1233–34 (10th Cir.2001); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066–67 (9th Cir.1996). The reasoning of these cases is persuasive and likely precludes defendant's current rule 59 challenge to the expert's methodology. The Seventh Circuit has considered rule 50 and 59 challenges based on the sufficiency of expert testimony in the absence of a *Daubert* motion. *Romero v. Cincinnati Inc.*, 171 F.3d 1091, 1095 (7th Cir.1999). However, the Court noted the absence of a *Daubert* challenge, apparently considering it as a factor favoring denial of the motions based on expert qualifications or methodology. *Id.*

There is little basis to challenge the methodology in any event. Plaintiff's expert used the market value of defendant's book of elevator service contract business as a measure of future lost profits. The expert considered actual market transactions where such assets were sold. The market value of such service contracts reflect the buyer's and seller's best estimate of the present value of the future income stream they are expected to generate. Contrary to defendant's assertion, such an approach does not double count past lost profits. While it might be debated whether the approach is more or less reliable than the more traditional process of estimating future sales and preforming present value analysis, both approaches are certainly legitimate approaches to reach the present value of future lost sales. There is no basis to grant a new trial on the grounds that future damages are excessive or unsupported.

■ Defendant's challenges to past damages concern the sufficiency of the evi-

dence supporting the underlying premises of the damages calculation. Specifically, defendant argues that the evidence did not support the percentage of defendant's service and new construction sales that plaintiff would have captured or the 8.8% incremental profit margin on new construction sales. Such challenges are clearly appropriate regardless of defendant's lack of a pretrial *Daubert* challenge. *See Romero,* 171 F.3d at 1095. However, the challenged factual determinations were the subject of genuine factual dispute at trial and there was ample support for the jury to have resolved those disputes in plaintiff's favor based on the evidence presented.

There was strong factual support for the determination that plaintiff would have made at least as many new construction Dover elevator sales as defendant. First, the testimony established that sales were brand driven. As the exclusive dealer of the brand it would be expected that the Dover sales would have been made by plaintiff. Second, the evidence at trial indicated that plaintiff's sales operation was more effective than defendant's newly organized branches. A witness familiar with both sales operations opined that plaintiff could readily achieve the same level of sales. From this it is reasonable to assume that plaintiff would have achieved at least the same level of success.

Defendant argues to the contrary that product sales were also largely price driven and that it would have sold to plaintiff at a higher price than it sold to its branches, thereby reducing plaintiff's potential sales. Defendant points to the testimony of its employees that low prices were offered to branches because of the potential to capture future service contract profits from purchasers. The jury was not bound to accept this obviously self-serving testimony in light of all the evidence presented at trial. It was established at trial that

defendant's manufacturing costs were well below the prices at which it sold to the branches and that defendant had sufficient manufacturing capacity to supply all that the branches could sell. There was nothing to counter the inference that defendant was maximizing its manufacturing profits by selling at that price. It was also to defendant's obvious advantage to gain Wisconsin market share for its Dover line.

It is certainly true that defendant stood to profit even more if it could capture service profits which were tied to new product sales. That fact alone, however, is far from sufficient to establish that it would have been better off selling fewer elevators at a higher price. The jury was not bound to accept defendant's testimony that it would have raised prices. Accordingly, the facts supported the jury's implicit finding that plaintiff would have received the lower price and would have achieved at least the same number of sales.

Defendant's contention that an 8.8 percent profit margin was unreasonably high is based primarily on the now rejected premise that the jury was bound to accept the testimony that higher prices would have been charged. Furthermore, a profit margin in that range was adequately supported by historical profit margins in the industry.

The jury's damages verdict was supported by a reasonable view of the evidence and plaintiff is not entitled to a new damages trial.

*Attorney's Fees and Costs*

■ Section 22925 of CEDA entitles plaintiff to recover attorney's fees for successfully pursuing its CEDA claim. Generally, when a cause of action for which fees are recoverable is joined with others for which they are not, the plaintiff may recover fees for all issues common to both claims. *Akins v. Enterprise Rent–A–Car Co. of San Francisco,* 79 Cal.App.4th 1127,

1133, 94 Cal.Rptr.2d 448 (2000). Furthermore, if liability issues are so interrelated that it would be impossible to separate them, formal apportionment of billing records is not required. *Id.*

■ While acknowledging that a portion of its contract claim did not overlap with the CEDA claim, plaintiff nevertheless seeks to recover all of the fees it incurred to litigate the case, $416,675. In contrast, defendant suggests that the dealership claim was such a minor part of the case that no fees should be awarded or, if some fees are to be awarded that the request be reduced by ninety percent. Reasonable attorney's fees are certainly somewhere in between the two proposed extremes. Under the circumstances of this case a determination of a lode star amount for the entire case and an apportionment between dealership and unrelated claims is an appropriate approach to establishing a fee award.

The $416,675 fee amount sought by plaintiff reflects the actual market billing rate charged by plaintiff's counsel and the actual hours spent on the case. The purpose of the lode star determination and any adjustments to it is to fix a fee at the fair market value of the legal services provided. *PLCM Group v. Drexler,* 22 Cal.4th 1084, 1095, 95 Cal.Rptr.2d 198, 997 P.2d 511 (2000). The fees in this case having been actually contracted in the market are presumptively fair market value. *See Mather v. Bd. of Trustees of Southern Illinois University,* 317 F.3d 738, 743 (7th Cir.2003).

The hourly rates of plaintiff's counsel are those negotiated with plaintiff and are apparently the rates counsel ordinarily bill in the market in which they practice and fall within the range of reasonable rates suggested by defendant's expert. There is no basis for a rate reduction. Defendant's principal argument is that the hours billed are unreasonable because plaintiff employed too many different lawyers. The number of lawyers by itself says little about the appropriateness of hours billed. Using many lawyers and staff has the potential for efficiency because it creates the possibility that work can be assigned to someone who specializes in a particular task or area or to the person with the lowest effective billable rate for the task. Using many lawyers also creates a potential for inefficiency as time is wasted in multi-lawyer conferences to exchange information. Simply counting lawyers and staff provides no useful basis to assess the overall impact of using multiple lawyers or the reasonableness of a fee. Finally, the plaintiff's use of a senior and junior lawyer for each phase of trial (one more than defendant employed) does not appear unreasonable, particularly in view of plaintiff's resounding success before the jury. The Court accepts plaintiff's fee submission as the appropriate lode star amount.

There remains the determination of an appropriate reduction from the lode star amount to reflect the fact that fees unrelated to the CEDA claim are not recoverable. Most of the attorney's fees sought would have been incurred even if only the CEDA claim had been pursued. This is because breaches of contract formed the basis for the substantial change in competitive circumstances. Indeed, as defendant noted in its motion for judgment as a matter of law on liability, and as the jury was instructed, to the extent that defendant's conduct was specifically permitted under the terms of the agreement it could not be the basis for a substantial change in competitive circumstances claim. The conduct which was the basis for the breach of contract claims was also the conduct supporting the CEDA claim. For this reason most of the discovery, evidence and argument related to both claims. Furthermore, it would have been impossible to

segregate the fees between the claims because they were so intertwined.

However, several areas of the litigation were unrelated to the CEDA claim. The statute of limitations was one year longer for the contract claim so that conduct occurring and damages arising between November 1999 and November 2000 were relevant only to the contract claim. In addition, plaintiff concedes that its contractual claim for defendant's initial encroachment into its exclusive territory is unrelated to the CEDA claim. It is also unclear that the claim for breach of the duty of good faith and fair dealing entirely overlapped. It cannot be said that these unrelated components of the case were so minor as to have a de minimis effect on fees. The Court believes that a reduction of fifteen percent would fairly eliminate the recovery of fees unrelated to the CEDA claim. Accordingly, a fee award of $354,174 is appropriate.

■ The CEDA remedies provision, § 22925, permits a dealer to bring an action "for damages sustained by the dealer as a consequence of the suppliers' violation of any provisions of this chapter, together with costs and reasonable attorney's fees." The parties dispute whether costs should be measured under federal or California law. Generally, when a federal court sits in diversity jurisdiction it applies the federal cost provisions because the award of costs is a procedural issue. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1064 (9th Cir.2003) (*citing Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)). However, in circumstances where costs are a substantive element of state determined damages, the federal court will apply the state substantive law. *Id.* at 1049; *See also Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 444 (7th Cir.1988). *Bright* held that the Wisconsin Fair Dealership Law, which provided for damages including "actual costs of the action, in-

cluding reasonable attorneys' fees" was such a substantive state law requiring application in federal court. *Id.* Specifically, the "actual costs language" authorized a shift of expert witness fees not ordinarily available in a procedural award of costs. *Id.*

Lacking the specific "actual costs" language or other language suggesting the recovery of expert fees, plaintiff's recovery is limited to the procedural definition of costs which excludes such fees. *Davis v. KGO–T.V., Inc.*, 17 Cal.4th 436, 950 P.2d 567, 568–69, 71 Cal.Rptr.2d 452 (1998) (considering similar language in the California Fair Equipment and Housing Act). Under such circumstances the award of fees in California courts is governed exclusively by state procedural law, Code Civ. P., § 1033.5. *Id.*, 71 Cal.Rptr.2d 452, 950 P.2d at 570. Plaintiff belatedly argues in it reply brief that this Court should apply the California procedural statute which might permit a greater recovery than 28 U.S.C. § 1920. However, where state law has determined that the issue of costs is a procedural issue, the choice of law is "between a state rule of procedure and a federal rule of procedure," and *Hanna v. Plumer* applies to require application of federal procedural law. *Clausen*, 339 F.3d at 1064. Accordingly, costs are to be taxed in accordance with Rule 54(d) and 28 U.S.C. § 1920.

### ORDER

IT IS ORDERED that defendant's motions for judgment as a matter of law or alternatively for a new trial are DENIED.

IT IS FURTHER ORDERED that plaintiff's motion for attorney's fees pursuant to the California Equipment Dealers Act is GRANTED in the amount of $354,174, and that judgment be amended accordingly.

IT IS FURTHER ORDERED that the taxation of costs is referred to the clerk pursuant to Rule 54(d)(1) and 28 U.S.C. § 1920.