Filed 1/28/20; Certified for publication 2/25/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HENSEL PHELPS CONSTRUCTION COMPANY, Plaintiff and Respondent, v. DEPARTMENT OF CORRECTIONS AND REHABILITATION, Defendant and Appellant. | B293427 (Los Angeles County Super. Ct. No. BC630469) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge.  Affirmed in part, reversed in part and remanded with direction.

Xavier Becerra, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Tamar Pachter and Jose A. Zelidon-Zepeda, Deputy Attorneys General, for Defendant and Appellant.

Watt, Tieder, Hoffar & Fitzgerald, David F. McPherson and Robert C. Shaia for Plaintiff and Respondent.

Plaintiff Hensel Phelps Construction Company (Phelps) was the low bidder on a public works contract awarded by the California Department of Corrections and Rehabilitation (CDCR) through competitive bidding, and commenced work on the project. Another bidder challenged the award of the contract to Phelps, and was successful, obtaining a ruling in a San Diego trial court that Phelps's bid was "non-responsive as a matter of law" due to its inclusion of "non-waivable mathematical/typographical errors." Phelps then brought suit against CDCR, seeking to recover the costs it expended on the project, under a statute which allows for such relief only if the contract is "determined to be invalid due to a defect or defects in the competitive bidding process caused *solely* by the public entity." (Pub. Contract Code, § 5110, italics added.)[1] CDCR sought judgment on the pleadings, arguing that the San Diego trial court's determination that the contract was invalid because Phelps's bid was non-responsive as a matter of law precluded recovery. The trial court disagreed, held a bench trial, and concluded that the San Diego trial court's ruling was *itself* the result of a defect in the competitive bidding process caused solely by CDCR. Judgment was entered in favor of Phelps. On CDCR's appeal, we reverse, concluding judgment on the pleadings should have been granted. However, we affirm the trial court's denial of recovery on CDCR's cross-complaint for disgorgement.

---

[1] All undesignated statutory references are to the Public Contract Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Award of the Contract to Phelps*

On March 17, 2015, CDCR issued an Invitation for Bid for the Ironwood State Prison Heating, Ventilation and Air Conditioning System – a project which was estimated to cost around $100,000,000.

The deadline to submit bids was April 30, 2015 at 2:00 p.m. Phelps submitted its bid on time. The bids were opened, and Phelps was determined to be the "apparent low bidder" with a price of $88,160,000.

On May 1, 2015, Phelps submitted an "amended bidder declaration." The April 30 bid had included a bidder declaration containing information pertaining to subcontractors Phelps intended to use on the project. Among other things, the original bid declaration had indicated the percentage of the contract work to be done by each subcontractor; the amended bidder declaration changed these subcontractor percentages.

Phelps believed it was permitted to submit its amended bidder declaration on May 1. During the bid process, prospective bidders had submitted questions to CDCR, which it answered in writing via amendments to the invitation to bid; in this way, all of the prospective bidders had access to the same information. It is undisputed that CDCR had issued an amendment containing a question and answer which permitted bidders to supply certain subcontractor information 24 hours after the bid deadline (the "Q24 answer"). What was disputed was whether the information that could be submitted a day late included the subcontractor percentages.[2]

---

[2]    Phelps's witness testified that allowing it to submit subcontractor percentages after the bid deadline enabled it to

3

CDCR took the position that subcontractor percentages could not, in fact, be changed by amended bidder declaration. It rejected Phelps's May 1, 2015 submission, and ultimately mailed it back to Phelps. Phelps was not immediately informed of the rejection, however.

In the meantime, on May 6, West Coast Air Conditioning Company, the second-lowest bidder, sent CDCR a complaint letter regarding Phelps's bid. CDCR did not review it, believing that it had no jurisdiction to hear bid protests.

Phelps was informed on May 13, 2015 that its May 1, 2015 amended bidder declaration was rejected. That same day, CDCR issued a notice of intent to award the project to Phelps. Phelps executed the contract on May 18, 2015. The Phelps vice-president who signed the contract testified that, when he did so, he understood that CDCR had rejected the May 1 submission. Nonetheless, he signed the contract, based on the April 30 bid alone, believing that the incorrect subcontractor percentages in the April 30 bidder declaration constituted an "immaterial deviation" which could be waived by CDCR.

## 2. *The San Diego Proceedings Commence*

On May 22, 2015, West Coast filed a petition for writ of mandate in the San Diego Superior Court seeking to invalidate the contract and prohibit Phelps from constructing the project.

---

obtain the best possible deal from its subcontractors, and therefore submit the best price it could for the project. That is, its subcontractors were permitted to wait until just before the bid deadline to submit their best prices to Phelps. Phelps incorporated those prices into its bottom line total bid price, but did not have time to update the math in its calculation of the percentages in its bidder declaration by the deadline.

4

In that proceeding, CDCR was the respondent and Phelps was the real party in interest.

### 3.  *Construction Begins*

As we shall discuss, section 5110 provides that when the award of a public contract is challenged, the contract may be entered into pending final decision of the challenge.  On July 3, 2015, CDCR executed the contract.  On July 7, 2015, it issued a notice to proceed to Phelps.  That day, Phelps began work on the project.

While the San Diego court proceedings were ongoing, Phelps continued to work on the project.  The parties stipulated that CDCR approved and paid Phelps's first three pay applications, in the total amount of $3,510,180.64.

### 4.  *The San Diego Court Invalidates the Contract*

On September 11, 2015, the San Diego court issued its minute order on West Coast's mandamus cause of action.  The order explained that West Coast sought to have the award of the contract to Phelps set aside for two reasons:  (1) Phelps's bid was non-responsive because it failed to list license numbers for its subcontractors; and (2) Phelps's bid "contained numerous arithmetical/typographical mistakes which required CDCR to reject [Phelps]'s bid as non-responsive because of these admitted errors which, according to West Coast, afforded [Phelps] a competitive advantage."  The court explained that errors which might otherwise render a bid non-responsive, requiring rejection of the bid, can be waived only if they could not have affected the price and could not have resulted in an advantage or benefit not allowed other bidders.  Under this standard, the San Diego court concluded the first error – the failure to list license numbers – was waivable and therefore immaterial.  The second error,

5

however, was not.  The court stated that it was "undisputed that the [Phelps] bid contained mathematical errors."  Phelps "argues that the errors were not material and . . . that, in essence, the defects could be waived."  The court disagreed, finding that the changes encompassed not only "immaterial percentages" but "certain subcontractor price amounts."  It held these changes material and, therefore, not waivable.

On October 5, 2015, the San Diego court issued a temporary restraining order, halting work on the project except work necessary to make the worksite safe (e.g., capping pipes, backfilling open excavations).

On December 9, 2015, the San Diego court issued its statement of decision to the same effect as its prior minute order.  The court's findings of fact included the following.  "[Phelps]'s bid contained numerous mathematical errors.  [Phelps] admitted the subcontractor percentages listed in its bid were not accurate or consistent.  [Phelps] further admitted it submitted a subcontractor information form after bid day which was intended to correct the subcontractor percentage and dollar amount errors in [Phelps]'s bid."  "[Phelps] argued the mathematical/typographical errors in its bid were immaterial errors because although [Phelps]'s post-bid day form changed the percentage of work to be performed by certain subcontractors, it did not change [Phelps]'s total bid price.  However, the evidence shows that [Phelps]'s post-bid subcontractor information form changed certain subcontractor prices, including the prices for subcontractors Graham Prewitt and Pacific Coast Iron, and that the bid day information for subcontractors was internally inconsistent in several respects as set forth in the declaration by [a witness]."  The court noted that Graham Prewitt's true price,

6

as reflected in the May 1 amended bidder declaration was $1,644,800 "more than the subcontract price stated by Graham Prewitt itself in a different portion of [Phelps]'s bid day bid submission." The court identified a similar $731,520 difference between Pacific Coast Iron's actual price (as stated in the May 1 amended bidder declaration) and Pacific Coast Iron's form included in the original bid. The court stated that "in at least four instances, [Phelps]'s subcontractor percentage listings (both on bid day and in the form submitted after bid day), are inconsistent with the subcontract prices (in dollars) listed in other parts of [Phelps]'s bid." In its conclusions of law, the court found these errors to be non-waivable.

Judgment was not entered until June 8, 2016. This was because West Coast had an additional cause of action against CDCR, for recovery of its bid expenses in promissory estoppel, which was tried in the interim, and resolved in favor of West Coast. The judgment permanently enjoined CDCR and Phelps from performing any further work on the project under the contract.

Phelps did not appeal, making the determination that it would instead pursue CDCR for its costs of construction in this action.

CDCR appealed only the promissory estoppel award in favor of West Coast; Phelps was not a party to that appeal. (*West Coast Air Conditioning Co., Inc. v. Department of Corrections & Rehabilitation* (2018) 21 Cal.App.5th 453, 456, fn. 2.)

**5.    *The Pleadings in This Case***

On August 12, 2016, Phelps filed its complaint against CDCR in this case, bringing a cause of action based on section

7

5110.[3] Subdivision (a) of that statute provides, in pertinent part, "When a project for the construction, alteration, repair, or improvement of any structure, building, or road, or other improvement of any kind is competitively bid and any intended or actual award of the contract is challenged, the contract may be entered into pending final decision of the challenge, subject to the requirements of this section. If the contract is later determined to be invalid due to a defect or defects in the competitive bidding process caused solely by the public entity, the contractor who entered into the contract with the public entity shall be entitled to be paid the reasonable cost, specifically excluding profit, of the labor, equipment, materials, and services furnished by the contractor prior to the date of the determination that the contract is invalid if [certain] conditions are met."[4]

Relying on section 5110 and the invalidation of the contract, Phelps sought its unpaid costs on the project. It alleged that the contract was "determined to be invalid by the San Diego Superior Court as a direct result of CDCR's actions and decisions during the competitive bidding process."

CDCR responded with a cross-complaint, pleading a cause of action for money had and received. Specifically, CDCR alleged

---

[3]    Phelps also brought a cause of action for declaratory relief founded on section 5110.

[4]    These conditions are that the contractor proceeded in good faith, the public entity reasonably determined the work was satisfactory, there was no contractor fraud, and the contract does not otherwise violate statutory or constitutional limitations. (§ 5110, subds. (a)(1)-(a)(4).) The trial court found that all of these conditions were satisfied, and CDCR does not challenge that determination on appeal.

8

that it had paid Phelps approximately $3.5 million on a contract which had since been determined to be void.  As a public entity, it was permitted to recover those funds.

**6.       *Motion for Judgment on the Pleadings***

Relying on the San Diego court's rulings, CDCR moved for judgment on the pleadings with respect to Phelps's complaint.[5] CDCR argued that Phelps could only prevail on its section 5110 cause of action if it established that the contract was invalidated "[d]ue to a defect or defects in the competitive bidding process caused solely by" CDCR.  It could not do so, because the San Diego court had in fact invalidated the contract because Phelps's bid contained material non-waivable errors.

Phelps's opposition argued that the San Diego court's invalidation of the contract was simply a prerequisite to this action.  It argued that the contract was, in fact, invalidated due to a defect in the bidding process chargeable to CDCR – specifically, "CDCR's failure to find [Phelps's] bid non[-]responsive in response to West Coast's bid protest (or to take any action whatsoever in response to West Coast's bid protest and subsequent [p]etition on the same grounds) and CDCR's decision to award the contract to [Phelps]."  Phelps conceded that it had made a mathematical error in its bid, but argued that the "focus of section 5110" is not on "the error in the bid itself" but the " 'competitive bidding process.' "  Phelps explained, "Mathematical bid errors occur frequently, but if the public owner rejects the error, then there is no 'defect in the competitive bidding process.'  In fact, under those proper

_____

[5]      CDCR's motion did not address its cross-complaint; its points and authorities stated it was "directed to both the first and second causes of action[] of [Phelps's] complaint."

9

circumstances, the competitive bidding process works correctly. The defect in the competitive bidding process in this case occurred, as recognized by the San Diego Superior Court, at the time the CDCR failed to acknowledge, evaluate, and reject [Phelps's] mathematical bid error, awarded the contract to [Phelps], and directed [Phelps] to perform work pursuant to that contract. That defect was caused solely by CDCR."

The trial court denied the motion for judgment on the pleadings, on the basis that Phelps's allegations were "sufficient to establish a factual dispute as to whether [CDCR] was the sole cause of the defect in the bidding process, as [CDCR] allegedly should have rejected [Phelps]'s bid."

7.    *Motion in Limine*

The case proceeded to a bench trial. CDCR attempted to relitigate the issue from its motion for judgment on the pleadings in a motion in limine to preclude all evidence except the San Diego court's statement of decision. CDCR added the argument that, even if Phelps were correct and there was some sort of defect in its process, the fact that the San Diego court found that there were errors in Phelps's bid meant that CDCR was not the *sole* cause of the bid invalidation.

In opposition, Phelps reasserted its argument that the San Diego court resolved only whether there was an error in Phelps's bid – not whether there were defects in the bidding process and which party had caused them. Phelps asserted, for the first time, two supposed defects in the bidding process attributable to CDCR: (1) it improperly rejected Phelps's May 1 amended bid declaration – had it accepted it, the contract would not have been invalidated; and (2) it did not inform Phelps that it had rejected the May 1 submission until after the statutory period for seeking

10

relief from a mistaken bid had lapsed (see § 5103 [five working days from bid opening]).

The first argument became Phelps's new theory of the case. Phelps asserted, "Our position in this case and the crux of this case is the defect in the competitive bidding process that was caused by CDCR is their rejection of the May 1st submission." Phelps took the position that the San Diego court "only determined that the April 30th portion of the bid was non[-]responsive. It did not determine which party was at fault for that. In this action we will prove that it was the fault of the CDCR when they refused to accept the May 1st supplemental submission; that's what resulted in the April 30th portion of the bid being deemed non[-]responsive."

The court denied the motion in limine, and proceeded to trial.

## 8. *The Bench Trial*

A seven-day bench trial was held, in which percipient and expert witnesses testified to the bid process and CDCR's review of Phelps's bid. The parties stipulated to the costs which would be recoverable by Phelps under section 5110 if it prevailed on its cause of action.

The trial court ruled in favor of Phelps.

## 9. *The Statement of Decision*

The court's statement of decision first rejected CDCR's argument that the San Diego court's ruling controlled the result in this case. The court explained: "[T]he issues under PCC § 5110 that were resolved in this action were not raised, addressed or adjudicated in the [p]etition proceeding in the San Diego Superior Court. Specifically, the San Diego Superior Court did not address or adjudicate whether 'defects' existed in the

11

'competitive bidding process.'  Also, it did not address or adjudicate whether the [c]ontract invalidation was due to any defects or which party caused those defects.  The San Diego Superior Court addressed a very limited and singular issue: Whether [Phelps's] *April 30, 2015* bid submission was non-responsive.  The San Diego Superior Court did not consider all of [the] documents comprising [Phelps's] bid as a result of defects in the competitive bidding process caused solely by CDCR."**6**

Specifically, the court found that Phelps's bid "lawfully consisted" of both the April 30 bid and the May 1 amended bidder declaration, and, as constituted, "fully complied" with the bid solicitation.  The court found that CDCR erred in rejecting the May 1 amended bidder declaration and that, if it had accepted it, the contract would not have been invalidated by the San Diego court.  However, the court also stated, "The only other possible scenario is where the CDCR properly accepts the May 1 Amended Bidder Declaration and includes that document in its review of the [Phelps] bid, as opposed to replacing the April 30 bidder declaration with the May 1 Amended Bidder Declaration.  Under this scenario, 100 [percent] of the bid documents submitted by [Phelps] would be reviewed as one package by [CDCR].  The evidence submitted at trial confirms that [agents of CDCR] performed this exact review and concluded that the changed

---

**6**      The court identified six defects in the competitive bidding process it charged to CDCR:  failure to follow its own Q24 answer in rejecting the May 1 submission; failure to timely notify Phelps it rejected the May 1 submission, failure to follow its own bid review protocol; failure to follow its contracting guidelines; violation of its own policy by issuing the Q24 answer; and failure to follow its bid protest protocol.

12

percentages in the May 1 Amended Bidder Declaration constituted a material deviation.  Where a material deviation is found, the entire bid must be rejected.  Thus, under this second scenario, the [c]ontract would not have been awarded to [Phelps].”

The statement of decision also addressed the cross-complaint, denying it “in its entirety.”

**10.**   ***Judgment and Appeal***

Judgment was entered in favor of Phelps in the amount of $2,989,819.35, the difference between the stipulated amount and the payments CDCR made.  CDCR took nothing on its cross-complaint.  Prejudgment and post-judgment interest were also awarded.

CDCR filed a timely notice of appeal.

***DISCUSSION***

On appeal, CDCR specifically disclaims any challenge to the court’s findings after trial.  It argues only that the court erred, as a matter of law, in denying its motion for judgment on the pleadings.  It also seeks judgment on its cross-complaint.

**1.**   ***Standard of Review***

A motion for judgment on the pleadings may be made on the same ground as a general demurrer, that the pleading at issue fails to state facts sufficient to constitute a legally cognizable claim or defense.  (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii).)  Our review is guided by the same rules governing the review of the sustaining of a general demurrer.  “ ‘We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]  We also consider matters which may be judicially noticed.’ [Citation.]  Further, we give the complaint a reasonable

13

interpretation, reading it as a whole and its parts in their context. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

## 2.    *Interpretation of Section 5110*

The issue presented by this appeal is actually a simple one. Section 5110 provides for recovery if, among other things, "the contract is later determined to be invalid due to a defect or defects in the competitive bidding process caused solely by the public entity." Does this language mean recovery is possible if "*the contract is invalidated for* a defect or defects in the competitive bidding process caused solely by the public entity"? Or does it mean that the contractor may recover if, "after the contract is invalidated, *it is determined that the invalidation finding itself was due to* a defect or defects in the competitive bidding process caused solely by the public entity"? CDCR argues for the former interpretation; Phelps the latter.

This is a question of statutory interpretation. " 'In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] "We begin by examining the statutory language, giving the words their usual and ordinary meaning." [Citations.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such cases, we " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that

14

would lead to absurd consequences." ' " [Citation.]' [Citation.]" (*Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1254.)

"Statutes and ordinances that authorize or require competitive bidding in the letting of public contracts ordinarily serve the purpose ' "of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable." ' Such measures 'are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose.' " (*Eel River Disposal & Resource Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209, 232, citations omitted.)

### A. The Statutory Language

Turning to the language itself, we conclude CDCR has the better argument. We must consider the key language in the context of the rest of the statute. The first sentence of section 5110, subdivision (a) provides, "When a project for [a public work] is competitively bid and any intended or actual award of the contract is challenged, the contract may be entered into pending final decision of the challenge, subject to the requirements of this section." It is the next sentence which provides, "If the contract is later determined to be invalid due to a defect or defects in the competitive bidding process caused solely by the public entity, [the contractor may recover]." The "later" in this sentence must refer back to the "pending final decision of the challenge" in the

15

sentence immediately preceding. In other words, the subdivision provides that the parties to a challenged public contract may enter into that contract pending final resolution of the challenge, but if the challenge is resolved by invalidation because the public entity was at fault, the contractor may recover.

Phelps's alternative construction is not reasonable. Phelps would interpret the statute to involve two distinct legal proceedings: (1) a challenge to the contract, which may result in the court invaliding the contract for any number of reasons; and (2) a second proceeding which looks beyond the reasons given for invalidation, to determine whether the court's invalidation of the contract was caused by any defects in the bidding process caused by the public entity. Nothing in the statutory language suggests there is to be a second proceeding, to consider the reasons for the first court's ruling.

We are also mindful of interpreting competitive bidding statutes in a manner which best comports with their purpose of benefitting property holders and taxpayers, not enriching bidders. An interpretation which precludes further contractor recovery once a court has invalidated the contract for reasons not solely chargeable to the public entity furthers this purpose.

### B.     The Legislative History

Section 5110's legislative history confirms the payment obligation under the statute rises and falls with the reasons given by the court actually invalidating the contract.

Prior to the enactment of section 5110, all risk of public contract invalidation was borne by the contractor. This was because compliance with competitive bidding statutes is mandatory, and when a contract was made without statutory compliance, it was "void and unenforceable as being in excess of

the agency's power." (*Miller v. McKinnon* (1942) 20 Cal.2d 83, 87–88.)  Such contracts " 'cannot be ratified; no estoppel to deny their validity can be invoked against the municipality; and ordinarily no recovery in *quasi* contract can be had for work performed under them.' " (*Id*. at p. 88.)  Under prior law, even if the contractor supplied labor and materials in the performance of the contract, no quantum meruit recovery was possible.  (*Ibid*; see also *Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 234–235.)  Although this often would create a hardship on the contractor, the rule was justified on the theory that, when a public entity is legally prohibited from making a contract, there is no practical public benefit achieved by allowing contractor recovery when the prohibition is disregarded.  (*Miller, supra*, 20 Cal.2d at pp. 88–89.)  Moreover, the contractor was considered just as bound as the public entity to ensure that the law's requirements were met.  If the contractor neglected this duty or chose to take the risk, the contractor was considered a mere volunteer.  In short, if the contract was legally forbidden, the law took the position that the contractor knew – or should have known – of this, and suffered losses it should have anticipated.  (*Id*. at p. 89.)

Section 5110 was enacted as a limited exception to this rule, in 2004.  The legislation was sponsored by the Construction Employers' Association, which felt trapped between two principles:  (1) a contractor on a public works contract later found to be void could be required to reimburse the public agency regardless of fault; and (2) a contractor must pay its subcontractors regardless of whether the contractor is paid by the project owner.  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 453 (2003-2004 Reg. Sess.) July 1, 2003, p. 3.)

17

As introduced, the bill allowed for recovery "[i]f the contract is later determined to be invalid due to a defect or defects in the competitive bidding process . . . ." There was no limitation based on which party or parties were responsible for the defects. (Assem. Bill No. 453 (2003-2004 Reg. Sess.) as introduced Feb. 14, 2003.) It was understood that the bill would "allow a contractor who has acted in good faith to recoup his or her costs if a contract is invalidated, because a public agency could otherwise refuse payment regardless of whether or not the agency or the contractor was at fault. Such a case has not yet arisen, but the sponsor is concerned that there is nothing to stop a cash-strapped public agency from doing so." (Assem. Com. on Business and Professions, Analysis of Assem. Bill No. 453 (2003-2004 Reg. Sess.) Apr. 29, 2003, p. 2.)

The bill was amended in the Senate on June 26, 2003 to add the language at issue in this case. It allows for recovery "[i]f the contract is later determined to be invalid due to a defect or defects in the competitive bidding process *caused solely by the public entity . . . .*" (Assem. Bill. No. 453 (2003-2004 Reg. Sess.) as amended June 26, 2003, italics added.)

A subsequent committee analysis indicated that, in opposition to the bill, the League of California Cities argued that it had been the law in California for a century that there can be no payments on void public contracts. "Supporters respond that the issue presented by the bill is one of fundamental fairness. If a contract is invalidated solely due to the fault of the agency, supporters argue, the contractor who relied upon the contract in good faith should be entitled to payment on work already done." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 453 (2003-2004 Reg. Sess.) July 1, 2003, pp. 4–5.)

18

In short, in enacting section 5110, the Legislature agreed to provide an exception to established law that had placed all the risk of public contract invalidation on the contractor. As originally proposed, the exception applied in all cases in which a contract was entered into while a challenge was pending and the contract was ultimately determined to be invalid due to a defect in the bidding process. As eventually enacted, the exception was limited to those cases where that defect was solely the fault of the public entity. But it is the defect for which the contract is invalidated – not the invalidation itself – which must be the fault of the public entity.

## 3. *Application*

Applying this interpretation of section 5110 to this case, it is apparent that CDCR's motion for judgment on the pleadings should have been granted. The motion was supported by a request for judicial notice of the relevant documents from the San Diego case – which indicated that the contract between CDCR and Phelps was invalidated "[b]ecause [Phelps]'s bid contained non-waivable mathematical/typographical errors" which rendered it non-responsive. In short, the contract was invalidated for a material error in Phelps's bid, not for any "defect . . . in the competitive bidding process," much less a defect "caused solely by" CDCR. Section 5110 cannot provide a basis for recovery.

In opposition to the motion for judgment on the pleadings, Phelps argued that, while the San Diego court found a material error in the bid, the focus of section 5110 is not on the errors in the bid but on the competitive bidding process. Phelps argued that it would establish that CDCR's failure to recognize and reject Phelps's mathematical bid error, and its subsequent award of the contract to Phelps, was an error in the competitive bidding

process caused solely by CDCR. In other words, Phelps argued that the error in its bid was irrelevant, because all that mattered were defects in the competitive bidding process, and the only defect in the competitive bidding process was CDCR's failure to reject Phelps's materially-flawed bid.

Even if we were to agree that CDCR were at fault to some degree for failing to reject Phelps's flawed bid, it was at a minimum the combination of Phelps's flawed bid and CDCR's failure to reject it which resulted in an invalid contract. But Phelps can only recover under section 5110 if the invalidation was due to a defect in the bidding process caused *solely* by CDCR; it cannot recover if the contract was invalidated for reasons that were even partly its own fault. The San Diego trial court's ruling establishes Phelps was at fault.

## 4. *Collateral Estoppel Confirms the Result*

Viewed as an application of the doctrine of collateral estoppel, we reach the same result. "Issue preclusion prevents 'relitigation of issues argued and decided in prior proceedings.' [Citation.] The threshold requirements for issue preclusion are: (1) the issue is identical to that decided in the former proceeding, (2) the issue was actually litigated in the former proceeding, (3) the issue was necessarily decided in the former proceeding, (4) the decision in the former proceeding is final and on the merits, and (5) preclusion is sought against a person who was a party or in privity with a party to the former proceeding. [Citation.] When those requirements are met, the propriety of preclusion depends upon whether application will further the public policies of 'preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants

20

from harassment by vexatious litigation.' [Citation.]" (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481.)

Each factor is established. (1) The issue is identical. The San Diego court determined whether the contract must be invalidated on any basis alleged by West Coast; in this case, the issue is on what basis the contract was invalidated. (2) The issue was actually litigated; the San Diego court rejected one of West Coast's proferred bases for invalidating the contract (omission of subcontractor license numbers) but accepted the other (material mathematical errors). (3) The issue was necessarily decided; it was not unnecessary to the prior proceeding. The San Diego court could not have invalidated the contract without determining on what basis, if any, the contract had to be invalidated. (4) The decision in the prior proceeding is final and on the merits. CDCR appealed a portion of the judgment relating to West Coast, but the parties chose not to appeal the invalidation of the contract. (5) Phelps was a party in the prior action; it was the real party in interest. Additionally, the public policies of preservation of the integrity of the judicial system and promotion of judicial economy are advanced by the application of collateral estoppel. It is difficult to believe the integrity of the judicial system would be advanced if, after the San Diego court held that the contract must be invalidated for a material error in Phelps's bid, the Los Angeles court could hold, to the contrary, that Phelps was actually blameless for the invalidation.

**5.** ***Phelps's Late-Raised Alternative Ground***

Although we have determined that judgment on the pleadings should have been granted based on the evidence before the court and the arguments made at the time, we briefly address the alternative theory first raised by Phelps in opposition to the

21

motion in limine, on which the trial court ultimately relied. The trial court found that the San Diego court's invalidation of the contract was itself due to a defect in the bid process caused solely by CDCR: its improper rejection of the May 1st amended bidder declaration.

First, as we have discussed, the statute simply asks why the contract was invalidated, and allows relief only if the contract was invalidated due to a defect in the bidding process caused solely by the public entity. If, as in this case, the contract was not invalidated for a defect in the bidding process caused by the entity, but instead for a non-responsive bid, that ends the inquiry.

Second, Phelps's theory at trial, which was also adopted by the trial court, was based on the premise that the *only reason* the San Diego court invalidated its bid was because of the errors in its April 30 bidder declaration which were corrected in the May 1 amended bidder declaration. But this is belied by the San Diego court's statement of decision, which states, "in at least four instances, [Phelps]'s subcontractor percentage listings (both on bid day and in the form submitted after bid day), are inconsistent with the subcontractor prices (in dollars) listed in other parts of [Phelps]'s bid." The court specifically identified the prices of two subcontractors which were materially different between not only the bidder declaration and the amended bidder declaration, but other documents in the bid and the amended bidder declaration. In other words, the San Diego court invalidated the contract for errors which would not have been remedied even if the May 1 amended bidder declaration had replaced the original bidder declaration.

22

Third, recovery under section 5110 is only possible when certain other requirements are met, including that the contractor "proceeded with construction . . . based upon a good faith belief that the contract was valid." The trial court found that Phelps acted in good faith, based on testimony from Phelps's vice-president that when he signed the contract on behalf of Phelps, he knew CDCR had rejected the May 1 amended bidder declaration, but believed the April 30 bid standing alone contained only immaterial, waivable errors. In other words, knowing that CDCR had rejected the May 1 amended bidder declaration – for whatever reason, proper or improper – both CDCR and Phelps believed in good faith that the April 30 bid standing alone was sufficiently responsive to support an award of the contract. That the trial court in this case ultimately concluded CDCR should not have rejected the May 1 submission is irrelevant; Phelps, with its eyes open, nonetheless agreed to risk the contract on the April 30 bid alone.[7] It was therefore partly responsible.[8]

---

[7] The trial court's finding that CDCR improperly delayed in informing Phelps that its May 1 amended bidder declaration was rejected means little without testimony that Phelps *would have* withdrawn its bid entirely had it timely been informed of the rejection. There was no such testimony; it likely would have been contradictory to the testimony that Phelps believed the April 30 bid contained only immaterial errors.

[8] Because we conclude the judgment in favor of Phelps on its complaint must be reversed, Phelps is no longer entitled to pre- and post-judgment interest. We therefore need not address any of CDCR's challenges to the calculation of these amounts.

**6.** *The Cross-Complaint*

On appeal, CDCR asks that we not only direct entry of judgment in its favor on the complaint, but "remand for entry of judgment" for CDCR on its cross-complaint for recovery of monies CDCR already paid to Phelps under the contract.

We question the procedure by which we can direct such judgment be entered. CDCR did not move for judgment on the pleadings on its cross-complaint. Although the trial court resolved the cross-complaint against CDCR at trial, CDCR has expressly chosen not to address the court's findings following the bench trial.

CDCR's argument on appeal seems limited to: (1) the legal proposition that, in the absence of section 5110, when the public contract is invalid, the contractor must disgorge payments made; (2) the San Diego court invalidated the contract; and (3) the parties stipulated to the amount of the payments CDCR made. CDCR argues that, in these circumstances, it has a right of action for recoupment. We do not question that CDCR had a right of action; our concern is that it is not pursuing any adverse disposition of that right of action on this appeal.

As CDCR never sought judgment on the pleadings on its cross-complaint; and can point to no stipulation that its cross-complaint rises and falls with the complaint, we cannot simply direct judgment in favor of CDCR.[9]

---

[9] Prior to the bench trial, the parties contemplated a jury trial. CDCR did not believe it would be necessary to submit the cross-complaint to the jury, taking the position that if it prevailed on the complaint, it would necessarily be entitled to recoupment. Phelps wanted the issue to go to the jury. The court asked CDCR's counsel, "If you were to get the verdict on their case, then

24

Although our disposition may seem hypertechnical, there is some equity to this result. The evidence reflects that some amount of the work done by Phelps was not work pursuant to the void contract, but work done to make the worksite safe after the San Diego court issued its injunction. CDCR has made no argument that Phelps performed that work as a volunteer, and is not entitled to retain any funds to compensate it for its substantial efforts returning the worksite to a safe condition.

We conclude that CDCR is not entitled to judgment on its cross-complaint, as it has not properly challenged the trial court's ruling on the cross-complaint.

### DISPOSITION

The judgment is affirmed in part and reversed in part. The matter is remanded with directions to the trial court to vacate its order denying CDCR's motion for judgment on the pleadings on Phelps's complaint and to enter a new and different order granting the motion. The judgment is affirmed to the extent it denies CDCR recovery on its cross-complaint. The parties shall pay their own costs on appeal.

RUBIN, P. J.

I CONCUR:

KIM, J.

---

if you don't have a cross-complaint, then how do you get disgorgement? Is there something in the code that automatically gives it to you?" CDCR's counsel responded, "No." The court said, "So then, you do have to have a cross-complaint."

Hensel Phelps Construction Company v. California Department
of Corrections and Rehabilitation
B293427


BAKER, J., Concurring



I join the opinion for the court with the exception of Part 4
of the Discussion.



BAKER, J.

Filed 2/25/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HENSEL PHELPS CONSTRUCTION COMPANY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, <br><br> Defendant and Appellant. | B293427 <br><br> (Los Angeles County Super. Ct. No. BC630469) <br><br> **ORDER CERTIFYING OPINION FOR PUBLICATION AND DENYING PETITION FOR REHEARING** <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

GOOD CAUSE APPEARING, the opinion in the above-entitled matter filed on January 28, 2020, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

Petition for rehearing is denied.

_____

RUBIN, P. J.               BAKER, J.               KIM, J.